[File No. 7299]

GLEN BURT, Respondent, v. LAKE REGION FLYING SERVICE, Inc., a corporation, Appellant.

(54 NW2d 339)

Opinion filed June 27, 1952

*Sinness & Duffy* and *John C. Haugland,* for appellant.

*F. E. Foughty,* for respondent.

GRIMSON, J. The plaintiff brings this action against the defendant for damages. In his complaint he contends that he is the owner of 240 acres in Sec. 30 and rents a quarter of land owned by his mother in Sec. 31, all in Township 154, Range 61, Ramsey County, North Dakota. That on July 2, 1950, he entered into a contract with the defendant, a domestic corporation, for the spraying of certain of those lands for the purpose of controlling weeds. He says: "That said defendant's officers and employees represented to the plaintiff that they were well acquainted with the various types of chemical weed killers and

that they possessed the necessary technical knowledge to apply the same to the growing fields of grain so as not to injure the growing crops thereon." Under that contract the plaintiff claims that certain of the above described fields were carelessly and negligently sprayed by the defendant causing the production of oats in such fields to be retarded and injured and that he was damaged thereby in the sum of $3920.00. The defendant answered admitting the contract and the spraying thereunder, but denying all other allegations in the complaint. The defendant makes a counterclaim for the work of spraying the crops at an agreed price of $197.10. The plaintiff replied to the counterclaim and alleges that the damages he suffered by the defendant's negligence in spraying the fields were far in excess of the benefits received from such spraying.

Upon trial of the case the jury rendered a verdict in favor of plaintiff for $1100.00 but granted the defendant a verdict on his counterclaim of $197.10 for which the plaintiff has given defendant credit upon his $1100.00 judgment.

Prior to the submission of the case to the jury the defendant made a motion for a directed verdict on account of the insufficiency of any evidence of negligence on its part. It also made a motion to dismiss the case on the same grounds. Both motions were resisted and denied. After the rendition of the verdicts the defendant moved for a judgment notwithstanding the verdict or for a new trial. It alleged as grounds, 1. "The evidence is insufficient to justify such verdict," and 2. "Errors of law occurring upon the trial." The motion was denied.

The defendant's specification of the insufficiency of the evidence is to the effect that there was no evidence that the defendant sprayed the crop with toxic or harmful chemicals and that the evidence entirely failed to show that the spraying was done negligently but on the contrary shows that the spraying was done in exact accord with the recommendations of the manufacturer and of the North Dakota Agricultural Extension Service. Further, that the evidence wholly failed to show that the crop had been damaged by the spraying and that the claim of damages was wholly speculative. The defendant also claims there is a conflict in the two verdicts on the theory that the

verdict for the spraying could only have been predicated upon the job done in accordance with the contract while the verdict for damages could only be predicated upon breach of contract.

The defendant assigns as errors of law the denying of the motions for a directed verdict or a dismissal and for judgment notwithstanding or for a new trial. He claims also there was error in the admission of some oral testimony and of the assignment from Isabella Burt to the plaintiff of her right to damages caused by the spraying.

The evidence shows that on July 2, 1950, fully a month after finishing his seeding the plaintiff approached Daniel Wakefield, the general manager of defendant, for the purpose of having some of his fields sprayed with chemicals for the destruction of mustard. The following conversation ensued:

"Q. Would you tell the jury what Mr. Wakefield said during that conversation?

"A. Well, I told him I wanted some oats sprayed for mustard and that I had heard about him doing a lot of spraying, I figured he was probably the best qualified of anyone in the Lake Region for the job. I asked him to come out home and look the fields over and he said he would come out the next day which he did.

"Q. Did Mr. Wakefield make any report to you as to his qualifications to spray?

"A. He did.

"Q. What did he say?

"A. He said that he was probably better qualified than anyone in this region for that type of work.

"Q. Did he tell you that he had sprayed many thousands of acres?

"A. He did.

"Q. Did you rely upon these representations made by Mr. Wakefield?

"A. Yes, I did.

"Q. Then did you, when you relied upon those representations of Mr. Wakefield, make an investigation as to how much spray should be applied and when the spray should be applied?

"A. No, I did not make any investigation. I had read a little

about proper application of 2, 4–D on grains but I did not make any real investigation.

"Q. Did Mr. Wakefield at any time state to you that the spraying would be done at your risk?

"A. No, he did not."

The next day Mr. Wakefield did inspect the fields and on the morning of July 4, 1950, the defendant sprayed for the plaintiff two fields of oats, one 40.9 acres and one 57.1 acres and two fields of wheat, one 16 acres and one 50 acres. In the spray he used a chemical called 2, 4–D sold under the trade name of "Weedeth." The particular type here used was anamine (amine) acid which is the weaker solution of 2, 4–D. Circular 108 of the North Dakota Agricultural College, entitled, "Control weeds with 2, 4–D" revised to 1951 was introduced in evidence as the official guide for 2, 4–D work in North Dakota and is based on recommendations passed at the annual meeting of the Northwest State Seed Conference. This recommends that anamine (amine) form "for selective weed control, especially on or near more susceptible crops or plants." 2, 4–D is said to control many broad leaved, annual weeds but generally to have little or no effect on grass weeds or grains. Each gallon of that mixture weighs four pounds.

This circular recommends the spraying of spring planted wheats, oats and barley with a maximum one-fourth to one-half pounds of 2, 4–D per acre at a time when the plants are fully "tillered." By that is meant that stage of development when the plants have stopped stooling or putting forth new shoots and lower branches have begun to dry up. It is stated that when applied improperly 2, 4–D may cause serious injury to susceptible crops and plants; that it would have a bad effect if applied at the boot stage or when the heads begin to develop. "Caution is urged to avoid injury from such things as drift, application on susceptible plants and crops, treating at wrong stage of growth, too heavy application," etc.

These recommendations and this caution are emphasized by the testimony of Wayne Colberg, Extension Entomologist for the Extension Service of the State of North Dakota, who tes-

934

tified: "An overdose of 2, 4–D would not only decrease the yield, it will completely kill the crop" but "if the 2, 4–D was applied according to the recommendations outlined in the circular there should have been no injury to oats." And he further testified it was possible that an overdose might decrease the production without completely killing the crop.

Raymond J. Fuxa, technical representative of the Miller Chemical Company, distributors of Weedeth, testified as to the care in the manufacture and shipping of Weedeth and the sealing of all containers to prevent any foreign substance entering them enroute. He said that Weedeth had been in use in nine states of the midwest for five years during which there had been "No complaint regarding damage occurring to oats from the use of Weedeth" except in this particular instance. During 1950, he testified, 27,000 gallons of Weedeth had been shipped to customers in the nine midwest states and no complaints of damage to any grain had been received except this one. At the recommended maximum of one and one-half pints to an acre that would mean the spraying of 143,900 acres. Spraying of one-half pint to the acre, as is claimed was done in the instant case, the acreage would be three times that number, or 431,700. That shows the extensive use of Weedeth without damage to the grain when correctly applied. Mr. Fuxa further claimed that the 1948 research report of the North Central Seed Control Conference indicated that more than one-fourth pound could safely be sprayed on Bonda oats in all stages except the boot and dough stages without depressing the yield. He admitted that if Weedeth is applied without regard for the directions provided and excessive amounts are applied the crop might be injured.

All the reports in evidence warn against any spraying at the "boot or early heading stages" which come after the "fully tillered" stage. The boot stage is that stage of development when the sheath of the uppermost leaf on the stem of grain encloses the inflorescence or budding of the plant and the head begins to develop. Naturally that is the most tender and least resistant stage of the development of the plant.

The testimony of the defendant is that the manager, Wakefield, with a flagman, proceeded to the plaintiff's fields on the

early morning of July 4th, to supervise the spraying. He found the grain 4 to 6 inches tall. They were followed by two airplanes, each equipped with a 44 gallon tank. Into these tanks 1 and ¾ths. gallons of 2, 4–D solution was measured by the use of a gallon jug. The tank was then filled with 42¼ gallons of water which amount was sprayed on 28 acres. That, the evidence shows, would amount to a spraying of one-fourth pound or one-half pint of 2, 4–D to the acre. From this tank the mixture was mechanically sprayed as the plane flew over the field at a height of about one foot above the ground depending on the wind and covering approximately 39 feet each flight. Two planes worked on this job and finished about ten o'clock in the forenoon. Mr. Wakefield, defendant's manager gave the direction for the mixing of the spray, which was done by the pilots, and super-vised the spraying application.

Adjoining the west side of the 57.1 acre field of sprayed oats were two low places of 4 and 5 acres, respectively, which were seeded with oats about a week after the larger tract had been seeded. There was also a ten acre tract across the road on the north side of the tract. Then on the northeast corner of the 57.1 acre field and between that and the trees surrounding the farm-stead, a small, irregular tract of 3.8 acres was seeded with oats at the same time as the larger tract. These three smaller tracts were not sprayed. There was some little difference in the prior years' cropping of the two small tracts on the west side and the ten acre tract on the north side from that of the 57.1 acres. The 3.8 acre tract, however, between the grove and the 57.1 acre tract had been tilled and cropped in preceding years in identical-ly the same manner as the larger tract. It was seeded the same time on identical soil with the same kind of seed. The moisture conditions were approximately the same. The trees might have caused a little more moisture on the edge of that tract adjoining them. The plaintiffs claim, however, that a little more rain fell towards the west of which the 57.1 acres and not the 3.8 acre tract had had the benefit.

The evidence shows that the plaintiff was a farmer with no ex-perience in the matter of spraying grain with chemicals for the destruction of weeds. Plaintiff had read of 2, 4–D spray but

made no study of it. Neither does it appear that that particular chemical was mentioned by the parties nor any discussion had as to the chemical to be used. The defendant manager, Mr. Wakefield, represented to plaintiff that he was well qualified for that work and that he had sprayed thousands of acres. He knew the purpose for which the spray was to be used. He examined the fields to determine whether the grain was in the proper stage for spraying. He was in full charge of the mixing of the spray and of its application. The plaintiff relied entirely upon him in all things in connection therewith. The agreement of the defendant included an implied warranty that the spray he was selling was fit for the purpose to be attained.

About August 10, 1950, the plaintiff in driving along the sprayed fields noticed that the mustard was drying but that the oats were of a "dirty brown color." He then noticed other differences in the growth of the stools and a lack of kernels in the heads. Before harvest he made an inspection of the oat fields and had Mr. Wakefield and Mr. Owens, the County Agent, as well as some neighbors, come out to look at the oats. Plaintiff testified:

"Q. Mr. Burt, upon your inspection of the grain grown in the 57 acres of sprayed oats, would you describe to the jury just what this oats looked like?

"A. One of the peculiarities of it I noticed it grew out of the ground with a bent look, like when it came from the ground, very distinct bent look. It was—there was various heights of growth, some of it was normal height, some short, lot of the stools only had one kernel when it came out and was not developed. Rest of it had very few kernels and it had a dirty, brownish, green color. That color stayed, did not vary in color from the time it headed out until I harvested it, seemed to stay like that until I harvested it.

"Q. At that time did you gentlemen inspect the oats in this particular neck, the 3.8 acres of unsprayed oats?

"A. Yes, I did.

"Q. What did that oats look like?

"A. It looked like good oats. It had good color to it and it

was uniform in height and also well developed kernels and I would say it had normal number of kernels in each head."

Mr. Stewart testified:

"A. The grain in there was short and kind of burnt little bit for some reason or another and very poorly filled, it was headed out at that time, half the kernels had turned black as well as the straw was discolored in the portion they said had been sprayed—that is about the best description I could give of that that had been sprayed."

Arthur Fenster, a neighboring farmer, and who was along on the inspection trip testified:

"Q. What did you find by inspecting the oats growing on this particular field here, which is the sprayed one?

"A. Lots thinner, was not many kernels, stalk was kind of dark and dried looking, green color like, joints were growing out crooked right about the ground."

Mr. Owens, the County Agent testified: "The 2, 4–D damage usually results in abnormal growth development, twisting of leaves and 'bentness' of stalk which does not entirely ever disappear."

The testimony shows that a line of demarcation between the unsprayed 3.8 acre tract and the sprayed 57.1 acre tract was plainly visible. On that Mr. Burt testified:

"Q. Now, Mr. Burt, did you notice a dividing line between the sprayed and unsprayed oats?

"A. Yes.

"Q. Would you describe to the jury just what this dividing line looked like between the sprayed and unsprayed oats?

"A. The unsprayed oats here they were yellow oats, heads were thick, very good stand of oats. On the side where the oats were sprayed they were distinctly different color, uneven in height.

"Q. Could you tell the line?

"A. Distinctly.

"Q. How distinct was that line?

"A. Very distinct.

"Q. Was it a straight line or a crooked line?

"A. Quite straight and quite pronounced."

Mr. Owens testified:

"Q. Mr. Owens, you did notice a definite line of demarcation between the sprayed and unsprayed oats?

"A. There was a line, yes sir."

Mr. Stewart testified:

"Q. Did you inspect this neck up here?

"A. Yes, I walked through that.

"Q. What did that oats look like?

"A. That was much better, they were taller, heavier stand, and heads were filled out better, did not have the black chaff on that that the others appeared to have. . . .

"Q. There was a break?

"A. Yes, from the good to the poor."

There was a power highline located on the north edge of the 57.1 acre tract. As the tract was being sprayed north and south the plane had to be turned before the portion next to and underlying the highline could be sprayed. The pilot testified that in order to spray the 30 foot strip so omitted he made flights east and west on both sides of the highline. He claimed that on the south side he flew about a foot from the ground and about ten feet from the poles. On the north side of the highline he had to fly some 25 or 30 feet from the ground. The wind was from the northeast causing a little southeast drift of the spray. The testimony is that the oats on a strip of approximately 30 feet under and along the highline grew much heavier than the oats on the rest of the tract. Mr. Burt testified:

"A. That oats looked like unsprayed oats, they were good oats. Very marked difference in that approximately thirty foot strip."

Mr. Stewart testified:

"Q. Would you say that the grain along the power line there and the grain in this 3.8 acres was more or less the same?

"A. Considerably alike, yes. I think the grain along under this highline and also in this neck here did not show no damage to me, according to my inspection.

"Q. In other words they were just about alike?

"A. Yes."

During the examination of these tracts, about August 21, 1950, Mr. Colberg took samples of the oats from both the sprayed and the unsprayed portions of the fields. Those samples he and an agronomist at the Agricultural College examined. He testified that they could not determine from that inspection what caused the damage but could not detect any evidence of 2, 4–D damage from those samples. The plaintiff and Mr. Wakefield also took samples from the sprayed and unsprayed fields. Their samples were introduced in evidence and were before the jury. On that the District Court in his memorandum decision, denying a new trial, said:

"At the trial the plaintiff introduced two samples of the oats straw, one sample being from the sprayed field and known as Exhibit 10 in the record, the other sample being from an adjoining, unsprayed field of oats of the same variety as the sprayed oats, and being Exhibit 11 in the record. Exhibit 10 from the sprayed field, offered in evidence showed the stems of the oats to be more or less bent, while Exhibit 11, coming from the unsprayed field, showed the stems of the straw to be straight. The defendant offered in evidence two samples of such straw, one from the sprayed field and one from the unsprayed field, being Exhibits 'F' and 'G.' Exhibit 'F' from the unsprayed field shows the stems straight and not bent. Exhibit 'G' from the sprayed field shows the stems to be bent."

The plaintiff claims that the average yield from the sprayed oats was only 11.1 bushels per acre while that of the unsprayed oats the average yield was 53.3 bushels per acre. Plaintiff's testimony is that the year 1950 was a good year for oats in that community. He claims the difference in the yield as his dam-

ages. It was stipulated the market price of oats on the day of the spraying was 75 cents per bushel.

The spray effectively destroyed the mustard. No claim is made by the plaintiff of damages to the wheat sprayed. One tankful had been sprayed partly on the wheat and partly on the oats. It is, however, a matter of general knowledge that oats develop much faster than wheat. The evidence shows that the wheat so sprayed was seeded on the 28th of May and the oats on the 2nd of June, only three days apart. The oats would more than make up those three days and would be in a more advanced stage than the wheat on July 4th, when both wheat and oats were sprayed.

The defendants contend that the testimony of the defendants to the effect that the spray was properly mixed and applied according to the directions of the Extension Division of the Agricultural College and the manufacturer was undisputed. Further, they contend that this testimony of the experts to the effect that they could not find any evidence of 2, 4–D damage when they inspected the fields in August was undisputed. For these reasons the defendant argues that their testimony must be taken as legally established and that it made out a complete case for the defendant entitling him to a dismissal of the action.

It does not necessarily follow that undisputed testimony must be believed by the jury. The credibility of witnesses is always for the jury. If undisputed testimony is contrary to the general experience of mankind the jury has a right to reject it. Kelly v. Jones, 290 Ill 375, 125 NE 334, 8 ALR 792. Then, of course, the jury has the right to take into consideration all the circumstances surrounding the matter concerning which the testimony is given in determining the weight to be given to that testimony. If reasonable men can come to different conclusions when that testimony is considered in the light of circumstances the final decision on that testimony is always for the jury. 20 Am Jur Evidence Sec 1180, p 1030.

On the other hand the plaintiff claims that when all the circumstances shown in the evidence are taken into consideration the jury could infer that the damage to the sprayed oats was caused by the negligence of the defendant.

An analysis of the evidence shows that when amine (anamine) acid solution of 2, 4–D is mixed, sprayed and used according to the directions of the manufacturer, of the Research Committee and of the North Dakota Agricultural College it does not cause any damage to oats or other grains. It had been used at the time of the trial for five years and sold by the manufacturer in nine midwestern states. In 1950, 27,000 gallons were so distributed. That was an amount sufficient to spray anywhere from 143,900 acres to 431,700 acres within the limits prescribed by the regulations. No complaints whatever had been received by the manufacturer. The defendant had sprayed thousands of acres in the vicinity of plaintiff's farm during the preceding three years and received no complaint. From this the inference can be drawn that if the 2, 4–D had been mixed and sprayed according to directions, no damage would have resulted.

The defendant was in entire charge of the mixing and application of the spray. He represented himself as well qualified. The plaintiff had little knowledge and no experience in the spraying of grains. The defendant owed the plaintiff a duty to see that the mixture sprayed was fit for the purpose intended and that the spraying would be carefully done.

The directions emphasize that the spraying should be done at certain stages of the development of the grain. The fully tillered stage, at which time the grain stops stooling, is a proper stage but it is emphasized that no spraying should be done during the following boot stage when the heads are forming. One tankful of this spray was applied partly to the field of wheat and partly to the field of oats. The wheat was not hurt. Oats were damaged. Wheat and oats were seeded about the same time but the oats would likely be at a further stage of development than the wheat when sprayed.

Small tracts of oats adjoining the sprayed oats were left unsprayed. One of these tracts was seeded at the same time and on ground identical in cultivation and soil with the field of sprayed oats. About five weeks after spraying the plaintiff noticed a difference in color and development between the sprayed and unsprayed oats. His neighbors and the county agent, the entomologist of the Agricultural College and Mr.

Wakefield were called to examine the fields. Testimony shows that the sprayed oats were of much poorer development and growth than the unsprayed oats. The difference in the sprayed and unsprayed tracts was such that a marked line of demarcation appeared where the two joined. Some characteristics of 2, 4–D damage were found such as bent stalks. Samples thereof were before the jury. Finally there was the difference in yields. Unsprayed oats yielded an average of 53 bushels to the acre while the sprayed oats yielded only 11 bushels to the acre. The only explanation for the difference in yields offered by the defendant was the presence of some aphids, grasshoppers and rust. According to the analysis of the agronomist the rust could not make that much difference nor is there any evidence of much damage by the aphids or grasshoppers which existed in both the sprayed and unsprayed oats to some extent.

Clearly there is sufficient evidence from which a jury of reasonable men, mostly farmers with experience in the raising of grain, could draw the inference that the damage to the oats was caused by the spray. While there is no direct evidence of any negligence by the defendant the circumstances were such that the jury could draw the inference that there must have been negligence by the defendant in the mixing or the application of the spray. There is no other reasonably probable explanation.

It is true that a verdict of negligence cannot be made to rest on mere speculation or conjecture. The evidence must present more than a mere possibility that the injury occurred in a particular way. "However, it is likewise true that negligence, like any other fact, may be proved by circumstantial evidence and that such evidence is sufficient to sustain a finding or verdict if it shows that in all reasonable probability the plaintiff's injuries were the proximate result of defendant's negligence." Nelson v. West Coast Dairy Co. 5 Wash2d 284, 105 P2d 76, 130 ALR 606.

In the case of Paine v. Gamble Stores, 202 Minn 462, 279 NW 257 the plaintiff sued for damages on account of the death of her husband. He had been found dead in the pit of the basement stairway abutting a public alley adjoining property leased

by the defendant. It was claimed the death was caused by defendant's negligence in failing to enclose the pit by a sufficient railing and that the deceased fell into the pit on account of the defective railing. There was no testimony how the deceased actually came to be in the pit of the stairway. The Minnesota Court in affirming a judgment against the defendant said:

"Plaintiff was necessarily confined to circumstantial evidence in the proof of proximate cause, but she has met the requirements which apply in such a case. The jury's finding that deceased's fall was occasioned by the defective railing is supported by an inference which, in view of the evidence, is clearly reasonable, and this is sufficient. 'It is only where the inference upon which the challenged finding rests is not itself reasonably supported, or where it is clear that the whole evidence is in manifest and undeniable preponderance against it (even though there is some support for it in the evidence), that there should be a reversal.' Maher v. Duluth Yellow Cab Company, 172 Minn 439, 442, 215 NW 678, 679."

In the case of Cobb v. Twitchell, 91 Fla 539, 108 So 186, 45 ALR 865, plaintiff sued the defendant for damages caused by the setting of a fire to burn off a right of way. He had a crew of eight men to keep the fire under control. "Witnesses for both plaintiff and defendant testified that the original fire was apparently completely extinguished at about 11 o'clock and that a vigilant lookout was kept continuously thereafter to prevent the spread of the fire in event of a recurrence. How the fire reappeared or recurred two hours thereafter on the outside of the fire guard in such volume as to quickly grow beyond the control of seven men is unexplained; one witness hazarded the observation that he supposed 'it must have went under the ground.' The fact remains, however, that fire did reappear or recur at the time and place and in the manner stated and damaged plaintiff's grove. No question of contributory negligence is involved." In sustaining a verdict for the plaintiff the court says:

"Negligence may be inferred from circumstances properly adduced in evidence, provided these circumstances raise a fair presumption of negligence; and circumstantial evidence alone

may authorize the finding of negligence. J. T. & K. W. Ry. Co. v. P. L. T. & Mfg. Co., 9 So 666, 27 Fla 1, 157, 17 LRA 33, 65; Southern Utilities Co. v. Matthews, 93 So 188, 84 Fla 30; Meier· & Lockwood Corp. v. Dakota Live Stock Co. 193 NW 138, 46 SD 397."

In Kelly v. Walgren Drug Store, 170 SW2d 35, the court says: "Circumstantial proof relied upon need not be of the degree to expel all other probabilities, and will be sufficient to submit the issue to jury and to sustain its verdict based thereon, if the proof coincides with logic and reason, and with that which a reasonable mind would conclude from the testimony adduced."

In 38 Am Jur, Negligence, Sec 333, page 1032, the rule is laid down that: "The law does not require every fact and circumstance which make up a case of negligence to be proved by direct and positive evidence or by the testimony of eyewitnesses. Proof of the fact of negligence may rest entirely in circumstances; in other words, circumstantial evidence alone may authorize a finding of negligence. Hence, negligence may be inferred from all the facts and attendant circumstances in the case, and where the circumstances are such as to take out of the realm of conjecture and within the field of legitimate inference from established facts, a prima facie case is made." See also National Biscuit Co. v. Litzky, 22 F2d 939, 56 ALR 853; Louisville Trust Co. v. Morgan, 180 Ky 609, 203 SW 555, 7 ALR 396; Scheurer v. Banner Rubber Co. 227 Mo 347, 126 SW 1037, 28 LRA NS 1207, 21 Ann Cas 1110; St. Germain v. Potlatch Lumber Co., 76 Wash 102, 135 Pac 804.

We are of the opinion that different conclusions can be drawn by reasonable men from the evidence and that there was sufficient evidence on behalf of the plaintiff to submit the case to the jury. The District Court did not err in denying the motions for a directed verdict or dismissal of the action. Cary Manufacturing Company v. Ferch, 67 ND 603, 610, 275 NW 255; State v. Yellow Cab Co., 62 ND 733, 736, 245 NW 382 and cases cited. 53 Am Jur, Trial, Sec 366, p 296.

That also applies to the motion for judgment notwithstanding the verdict which is but a motion for delayed action on the motion for a directed verdict. McLeod v. Simon, 51 ND 533, 541, 200

NW 790; Weber v. United Hardware and Implements Mutual Company, 75 ND 581, 31 NW2d 456.

The defendant contends, however, that even if the damage was caused by the negligence of the defendant there was no competent evidence as to the amount of damages so that the verdict of the jury was wholly speculative.

The trial court instructed the jury that "In arriving at such damages, if you come to that question, you will determine from the evidence the number of bushels of oats the plaintiff threshed from the two plots of land that were sprayed, then you will determine from the evidence the additional number of bushels of oats that he would have obtained from the two plots of land if the alleged injury had not occurred and you will determine from the evidence the value of this additional number of bushels on the farm of the plaintiff as of the time of the alleged injury, the 4th of July 1950."

This instruction is in accord with the principle laid down in many cases of the failure of seed to produce or of a fertilizer to be effective. The measure of damages in such cases where a partial crop is produced is the difference in value between the crop actually produced and that which would have been produced had there been no failure in the seed or in the fertilizer. McLane v. Peavey Company, 72 ND 468, 8 NW2d 308; Moorhead v. Minneapolis Seed Co., 139 Minn 11, 165 NW 484; Barthelemy v. Foley Elevator Co., 141 Minn 423, 170 NW 513; Stuart v. Burlington County Farmers Exchange, 89 NJ Law 12, 97 Atl 775; Philbrick v. Kendall, 111 Me 198, 88 Atl 540.

Acting under this instruction the jury could consider everything in the evidence bearing on the difference in the number of bushels and the value of the crops actually raised and that which would have been raised but for the injury.

In the instant case there was before the jury evidence of the yield of the sprayed and unsprayed oats from tracts that were side by side and of practically the same cultivation and soil. That is evidence from which a jury under the instructions of the court could draw a conclusion as to the damages rendered by the spraying if they found the spraying was the cause of the damage.

Plaintiff's evidence showed that the unsprayed oats yielded an average of 53 bushels to the acre, while the sprayed fields yielded only an average of 11 bushels to the acre. That would make a difference of 42 bushels per acre. The two fields of sprayed oats amounted to 98 acres. That would make a total loss of 4116 bushels. It was stipulated that the market price of oats on July 4, 1950, the day of the spraying was 75 cents per bushel. That evidence furnishes a basis for the jury to find the loss anywhere up to $3087.00.

The defendant, however, claims that even if it had been negligent some of the reduction of yield was due to other causes. He shows some damage by rust. The entomologist testified that estimating the damage from rust on the sample of sprayed oats that loss would amount to 13.75 bushels per acre. That would still leave 39.25 bushels per acre loss from other causes. The only other causes of damage pointed out by the defendant were some possible differences in moisture and cultivation, and the presence of some grasshoppers and aphids in both fields. There is no evidence of how much those causes would affect the yield. That would have to be determined by the difference in the extent of such causes in the sprayed and unsprayed fields.

The jury awarded the plaintiff a judgment of only $1100.00 or $1987.00 less than the maximum that could have been allowed under plaintiff's evidence. The jury was largely composed of farmers who were well qualified from their knowledge and experience in such matters to judge of the loss that was likely to result from the other causes mentioned in the evidence. They disallowed almost two-thirds of plaintiff's claim for such other causes. Clearly the verdict indicates that the jury tried to be fair.

There is no way to determine these damages with absolute certainty because no one can tell exactly what would have happened if the defendant's acts had not interfered with the course of nature. There is, however, in the instant case a fair amount of evidence from which a jury could estimate the damages with a fair amount of certainty. It does not seem as if on a new trial

any more satisfactory basis from which a jury could determine the amount of damages could be offered in evidence.

The defendant further argues that the separate verdict brought in by the jury for the defendant for the whole amount of its claim is contradictory to the verdict for the plaintiff for damages in that if the defendant is entitled to the full amount of its claim for spraying that must constitute a finding that it committed no breach of contract. In addition to forms of verdicts for and against the plaintiff the court submitted to the jury separate forms of verdict on defendant's counterclaim for and against the payment of his services for spraying. No objection was made by the defendant to the submission of those separate verdicts nor to the court's instructions thereon. In addition to the separate verdict of $1100.00 for the plaintiff the jury brought in a verdict for the defendant for the full amount of its counterclaim, $197.10.

Under the instructions the jury was justified in absolutely separating the two claims. When it found for the plaintiff it compensated him for all the damages defendant had caused him, and left the defendant in the same condition as if he had performed his contract. The plaintiff has allowed that full claim on his judgment against the defendant. The defendant is not prejudiced by the manner in which that was done. It was rather to his advantage. The plaintiff is not objecting and the defendant can not take advantage of anything that is favorable to him.

An error at law is claimed with regard to the admission of the following opinion evidence. The plaintiff testified:

"Q. In your opinion what caused the injury to the oats crop growing on the 57.1 acres of oats that was sprayed by the Lake Region Flying Service in Section 30?

"MR. HAUGLAND: Object, Your Honor, on the ground that the witness is not qualified to answer that question because he has not the proper background to answer questions of that nature.

"THE COURT: Overruled.

"Q. What is your opinion?

"A. I believe the oats were hurt by the spray."

Later the court came to the conclusion that he had erred in admitting that evidence and the following proceedings were had:

"THE COURT: Members of the jury, during the direct examination of the plaintiff, the Court permitted the plaintiff to testify as to whether or not, in his opinion, there was any damage to the crop, the damage was not the result of natural causes and to testify as to whether or not the damages claimed were the result of spraying. I believe that is the question that is involved.

"MR. HAUGLAND: That's right.

"THE COURT: Is that right, Mr. Foughty?

"MR. FOUGHTY: That's right.

"THE COURT: I find the court was mistaken in permitting that testimony and the court is striking out that testimony and cautioning the jury to pay no attention to the testimony of the plaintiff that the damage to these crops was not the result of natural causes and was the result of the spraying, that is, if the jury finds there is any damage."

In his instructions to the jury the judge said: "Keep in mind to disregard the testimony I have struck out and instructed you to disregard, and consider only the testimony that is in the case." Clearly if there was error in the admission of the evidence it was cured by the prompt action of the court and caution to the jury. Pipan v. Aetna Insurance Company, 60 ND 657, 235 NW 719; Seckerson v. Sinclair, 24 ND 326, 140 NW 239.

The only other error of law specified is that the court erred in admitting the assignment to plaintiff by his mother of all her claim for any damages that might arise out of this spraying of the crop in question. She owned some of the land sprayed. The assignment also appointed the plaintiff as her agent to sue or recover upon such claim. The objection was: "We object, Your Honor, incompetent, Question whether such an action of this nature can be assigned." Sec. 47–0703 NDRC 1943 provides that "A thing in action arising out of the violation of a right of property" may be transferred. The objection was properly overruled. On argument this defendant claims that this evidence was inadmissible under the pleadings. The pleading had alleged "that the said Isabella Burt has assigned all her interest in the

aforementioned growing oats crop to the plaintiff." The objection made was not sufficiently clear to raise that question.

The judgment of the District Court is affirmed.

MORRIS, C. J., and CHRISTIANSON, SATHRE and BURKE, JJ., concur.