1997 ND 38

Darren ENDRESEN, Plaintiff
and Appellee,

v.

SCHEELS HARDWARE AND SPORTS
SHOP, INC., Defendant.

Beretta USA Corp., Defendant
and Appellant,

and

Accuracy, Inc., d/b/a Ultramax
Ammunition, Defendant.

ACCURACY, INC., d/b/a Ultramax
Ammunition, Third–Party
Plaintiff,

v.

WINCHESTER–WESTERN DIVISION,
OLIN CORPORATION, Third–
Party Defendant.

Civil No. 960159.

Supreme Court of North Dakota.

March 5, 1997.

Jonathan C. Eaton (argued), of Eaton, Van de Streek & Ward, Minot, for plaintiff and appellee.

Robert J. Hovland (argued), of McGee, Hankla, Backes & Wheeler, Ltd., Minot, and Lawrence G. Keane (appearance), of Pino & Associates, White Plains, NY, for defendant and appellant.

NEUMANN, Justice.

[¶ 1] Beretta USA Corporation (Beretta) appeals from a judgment awarding Darren Endresen $259,079.21 in damages, costs and disbursements in this personal injury products liability action. We affirm the judgment as to liability, but reverse and remand for a clarification of damages.

[¶ 2] On November 25, 1991, Endresen purchased a used Beretta Model 92F 9 millimeter (mm) pistol from Scheels Hardware and Sports Shop, Inc. (Scheels) in Minot. At the time, Endresen was 25 years old, single, and living on his parents' farm near Ryder. On January 12, 1992, Endresen purchased at Scheels hollow point ammunition remanufactured or reloaded by Accuracy, Inc. (Accuracy). The boxes containing the ammunition did not identify it as reloaded ammunition and Endresen was unaware of that fact. Olin Corporation (Olin) manufactured the original shell casings for the reloaded ammunition.

[¶ 3] On January 14, 1992, Endresen was driving home after dark from his job at Hill Top Repair, an equipment repair shop, when he saw a rabbit pass in front of his pickup headlights. Endresen stopped, stepped outside of his pickup, and fired the pistol at the rabbit. He missed the rabbit and began shooting at a nearby fencepost for target practice. According to Endresen:

> "On the tenth round [the pistol] recoiled a lot harder than normal. There was a bright flash and it, well everything in my eye went red, black or I couldn't see anything."

A highly overpressured cartridge had burst near its head while positioned in the pistol chamber.

[¶ 4] Endresen drove home and family members took him to a Minot hospital, where he was immediately transferred by airplane to the University of Minnesota Hospital for treatment. While there, Endresen underwent three surgeries which resulted in the removal of a 2 by 2 by 4.5 mm piece of metal from his right eye. Doctors were unable to remove another piece of metal, which remains in that eye. Endresen is legally blind in his right eye and is expected to remain so. His right eye is Endresen's "dominant eye" and the injury has impaired his depth perception and peripheral vision making it difficult for him to do his farm and machinery work.

[¶ 5] Endresen sued Scheels, Accuracy, Olin, and Beretta, alleging he sustained the eye injury as a result of defective ammunition and a defectively designed handgun.

Scheels was later dismissed from the action, and Endresen entered into settlement agreements with Accuracy and Olin before trial. The parties stipulated to a trial to the court without a jury on Endresen's claim Beretta was liable because the Model 92F pistol is improperly designed to adequately handle defective ammunition. The parties stipulated and the trial court found Endresen was "entirely without fault in this matter and in no way contributed to his injury." The trial court ruled in favor of Endresen, finding:

### "XI.

"That the chamber of the Beretta pistol is not fully supported and the cartridge burst took place at the approximately 6 o'clock position where the chamber gives very little support as it is cut away to provide a feed ramp for the rounds entering the chamber from the magazine located in the grip of the gun;

### "XII.

"That the round that ruptured was overloaded with powder, but overloads are a common occurrence and well known in the industry as is the use of reloaded or remanufactured ammunition, and that cartridge casings become thinned and weakened when reloaded or remanufactured.

### "XIII.

"That it was demonstrated to the Court's satisfaction that the overload, and/or the condition of the cartridge casing, was not the sole cause of Plaintiff's injury;

### "XIV.

"That the design of the Beretta pistol was such that it permitted an overloaded cartridge to more easily rupture since there is insufficient support at the chamber's entrance;

### "XV.

"That the evidence supports the finding that in this case the gas from the burst cartridge filled the trigger well and then blew out the hole beneath the trigger bar and up against the trigger bar. The metal pieces which struck Plaintiff's face and eye may have been deflected backward off the inside surface of the trigger bar, but very likely could have also come from the top of the open chamber.

### "XVI.

"That it is found that other 9mm pistols do have better supported chambers and provide a route for escaping gases which pose less danger to the shooter. Alternative designs rendering the gun less dangerous were available;

\* \* \* \* \* \*

### "XVIII.

"That the subject pistol was unreasonabl[y] defective and dangerous because of an inadequately supported chamber and that the injury would not have occurred in an adequately supported chamber. Likewise the design of the trigger bar and venting system was such as to render the gun defective and unreasonably dangerous when used with overloaded ammunition;

\* \* \* \* \* \*

### "XXI.

"That the Plaintiff's injury was proximately caused by the combination of an overloaded cartridge and a defectively designed gun in equal proportion."[1]

[¶ 6] The trial court awarded Endresen $38,781.83 for medical and related expenses, $5,000 for loss of productive time, $20,000 for pain and suffering, and $130,000 for permanent disability. The trial court ordered judgment "against Defendant Beretta in the sum of $193,781.83 ... as Defendant's share of the damages suffered by Plaintiff as a result of causes for which Beretta is responsible

---

1. Contrary to Beretta's assertion on appeal, we deem the findings sufficiently stated so we can understand the factual basis for the trial court's decision. *See, e.g., Porth v. Glasoe,* 522 N.W.2d 439, 444 (N.D.1994).

..., plus interest, costs and disbursements." Beretta appealed.

## I

[¶ 7] Beretta challenges many of the trial court's findings of fact in this case.

 [¶ 8] In order to recover for injuries sustained as a result of a defective condition in a product, unreasonably dangerous to a consumer, the plaintiff must show by a preponderance of the evidence the product was defective in design or manufacture; the defect rendered the product unreasonably dangerous to the consumer; the defect existed when the product left the manufacturer; and the defect was a proximate cause of the plaintiff's injuries. *Kaufman v. Meditec, Inc.*, 353 N.W.2d 297, 300 (N.D.1984). *See also* 4 L. Frumer and M. Friedman, *Personal Injury, Firearms* § 1.05 (1996). Whether "a manufacturer fits within the parameters of strict liability in tort is essentially a factual question for the trier of fact" which will not be reversed on appeal unless it is clearly erroneous under N.D.R.Civ.P. 52(a). *Stillwell v. Cincinnati Inc.*, 336 N.W.2d 618, 622 (N.D.1983). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if this court is left with a definite and firm conviction that a mistake has been made. *American Ins. v. Midwest Motor Express*, 554 N.W.2d 182, 185 (N.D.1996).

## A

[¶ 9] As is usually the case in products liability actions involving technical, scientific or complex matters, expert opinion evidence was offered on the question whether the Model 92F is unreasonably defective and dangerous. *See generally* Annot., *Products liability: admissibility of expert or opinion evidence that product is or is not defective, dangerous, or unreasonably dangerous*, 4 A.L.R.4th 651 (1981). The use of expert witnesses in products liability actions involving firearms is not uncommon. *See, e.g., Continental Casualty Company v. McClure*, 225 So.2d 590, 591 (Fla.Ct.App.1969); *Lopez v. Heesen*, 69 N.M. 206, 365 P.2d 448, 454 (1961); Annot., *Products liability: firearms, ammunition, and chemical weapons*, 15

A.L.R.4th 909 (1982), and cases collected therein; Annot., *Products liability: modern cases determining whether product is defectively designed*, 96 A.L.R.3d 22 § 23 (1979), and cases collected therein. A major argument underlying Beretta's assertion that the trial court's findings are clearly erroneous is the trial court erred in admitting the testimony of Endresen's expert witness, Stanton O. Berg, a firearms consultant.

 [¶ 10] The qualifications of an expert witness are primarily for the determination of the trial court, and its determination will not be reversed on appeal unless that discretion was abused. *Oberlander v. Oberlander*, 460 N.W.2d 400, 402 (N.D.1990). N.D.R.Ev. 702 allows a witness qualified as an expert to testify in the form of an opinion "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue...." In *Anderson v. A.P.I. Company of Minnesota*, 1997 ND 6, ¶ 9, 559 N.W.2d 204, we recently explained:

"Rule 702 envisions generous allowance of the use of expert testimony if the witnesses are shown to have some degree of expertise in the field in which they are to testify. *Matter of Estate of Aune*, 478 N.W.2d 561, 564 (N.D.1991). The rule does not require an expert to have a formal title or be licensed in any particular field, but recognizes it is the witness's actual qualifications that count by providing that an expert can be qualified by knowledge, skill, experience, training, or education. *Oberlander;* 3 *Weinstein's Evidence* ¶ 702[04] (1996). Thus, an expert witness's 'knowledge may be derived from reading alone in some fields, from practice alone in some fields, or as is more commonly the case, from both.' I *McCormick on Evidence* § 13, at pp. 54–55 (4th ed.1992) (footnote omitted). While the trial court decides the qualifications of the witness to express an opinion on a given topic, the trier of fact decides the expert witness's credibility and the weight to be given to the testimony. *Construction Assoc. v. Fargo Water Equip.*, 446 N.W.2d 237, 239 (N.D.1989)."

[¶ 11] Beretta asserts Berg was not qualified to testify as an expert in gun design, and the trial court therefore abused its discretion in allowing him to render opinions concerning design defects in the feeding ramp and gas venting system of the Model 92F. Beretta claims Berg is unqualified because he has never designed a firearm of any type, has never worked in a manufacturing plant, is not a mechanical engineer, has no experience in tooling or diecasting, and has no expertise or experience in the area of feeding or gas venting system design of semi-automatic guns.

[¶ 12] Berg has testified as a firearms expert in several reported judicial decisions, *see, e.g., Savage Industries, Inc. v. Duke*, 598 So.2d 856, 857 (Ala.1992); *Cobb v. Insured Lloyds*, 387 So.2d 13, 18 (La.Ct.App.1980); *State v. Lindsey*, 284 N.W.2d 368, 374 (Minn. 1979); *Classen v. Remington Arms Co.*, 379 N.W.2d 133, 134 (Minn.Ct.App.1985), and his resume' indicates he has extensive experience with firearms. The resume' lists Berg's numerous presentations of papers and lectures, and his published papers and articles, on firearm safety design. He has "handled over 850 firearms cases." Berg acknowledged that one trial court in 1987 ruled he was not qualified to render an opinion on firearm design, but noted he has been permitted to give design testimony "20 or more times since that time."

[¶ 13] The trial court was aware Berg had never been accepted as an expert on gas venting systems, but was also aware Berg had published an article on a gas venting system for a bolt action rifle. Berg acknowledged the different mechanisms in semiautomatic and bolt action firearms, but said "the same general things are in mind as to what type of supports the cartridge has that would allow it to fail, what venting systems there are in that particular firearm to allow gas when it does escape to vent out again harmlessly and that sort of thing." The trial court allowed Berg to testify, reasoning:

"This is a bench trial. It's not a jury trial. It's not a case where I have to be worried about a jury being led astray. Maybe I will be led astray before the case is over. I think because it is a bench trial I have the luxury of being a little more liberal at least on the initial receipt of any evidence. Certainly the witness's experience or lack of experience in gas venting systems will be a consideration when I make my decision."

[¶ 14] Appellate courts are reluctant to interfere with the broad discretion afforded trial courts in determining the qualifications and usefulness of expert witnesses. *See Anderson*, at ¶ 17, 559 N.W.2d 204. A trial court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, or when its decision is not the product of a rational mental process. *Bruner v. Hager*, 547 N.W.2d 551, 554 (N.D.1996). We cannot say the trial court abused its discretion in admitting Berg's testimony and treating his lack of direct experience with specific feeding and gas venting system design of semi-automatic weapons as bearing on the weight of his testimony.[2]

B

[¶ 15] Beretta asserts the trial court's finding Endresen's injury was proximately caused by a defect in the Model 92F is clearly erroneous because Endresen failed to meet his burden of proving either the pistol's feed ramp design or venting system proximately caused his injury. The basis for Beretta's argument is because the source of the metal fragment removed from Endresen's eye is unknown, and it is uncertain how it got into his eye, Endresen failed to meet his burden of proving proximate cause.

[¶ 16] The trial court's finding the Model 92F is defectively designed to handle overloaded, reloaded cartridges with weakened casings is amply supported by Berg's testimony. Berg testified the use of reloaded ammunition is common among firearm users

2. Likewise, Beretta's complaints about the "unreliability" of Berg's "inaccurate, untested opinions" goes to the weight, rather than the admissibility, of Berg's testimony. The weight and credibility given to an expert's testimony is a question for the trier of fact. *See Stillwell*, 336 N.W.2d at 621. Beretta has not convinced us any of the trial court's weight and credibility determinations are clearly erroneous.

and reloaded ammunition is more likely subject to overloading than brand new ammunition. Berg testified the design flaw was an insufficiently supported chamber at the bottom of the cartridge in the chamber. According to Berg, other brands of pistols can be, and are, sufficiently supported in that area. He explained other causes, in addition to the overloaded cartridge, that contributed to Endresen's injury:

"A Well the fact that the bottom side of the chamber was unsupported in the area in which the cartridge actually burst. That portion of the chamber had been cut away in order to make a feed ramp for the bullet ... or the cartridge as it's fed into the chamber. In addition the open slot on the right side of the receiver in which the trigger bar moved forward and back left a natural opening for any high pressure gases to vent out that opening. And I felt the trigger bar out there, it is in a flat back side would act as a deflector for material coming out of the breech mechanism. Under the area on which the cartridge would be seated directly under that is kind of an open box in which the trigger moves as it's pulled and pulls with it the trigger bar and the open [box is] a natural area that any escaping gases are going to be drawn into.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q And in this case is it your opinion that the Beretta gun involved in this lawsuit was dangerously defective because of the lack of support you have described in earlier testimony?

"A Well it's defective in the area of support as it relates to the chance of having an occasional high pressure loading.

"Q Is it your opinion that had it been adequately supported in this gun the high pressure burst that in fact occurred would not have caused the injury suffered by the plaintiff?

"A I think that is true in this case.

"Q Is it also your opinion that the venting system properly designed would have protected Mr. Endresen?

"A Well the two go together. The support and the venting. In this case the venting was in such a direction that it seems logical to look at the configuration and conclude that anything blowing out the side there would be deflected by the trigger bar and as a result the individual shooting may be hit by fragments.

"A The other guns that I talked about don't have a hole in the side that this material could come out. It appears in most of the configurations the material would go down into the magazine well."

[¶ 17] We also disagree with Beretta's assertion there was no proximate cause established because Endresen failed to prove the precise source or route of the metal fragment removed from his eye. There is no dispute the metal fragment removed from Endresen's eye was not part of the shell or the gun. Berg thought the piece could have been a "bit[ ] of metal ... left in the gun as part of [the] manufacturing process," but added:

"A Well it's obviously a lost piece of some type of white metal that got blown out at that time. I am not saying I know where it came from. It obviously was blown out by this defect in the shell. I don't see where it makes any difference. A piece of metal was broken out."

[¶ 18] Beretta's expert witness, J.B. Wood, disagreed with Berg's theory that the most likely route of the metal fragment, whatever its source, was from the opening behind the trigger bar, explaining:

"A ... It could have gone any direction. If indeed it, you know, came as it's described it would not necessarily have come as you just described it. It could have come from any direction.

"Q Do you have an opinion of your own as to the route followed by the metal fragment that ended up in the plaintiff's right eye?

"A No. I don't think it's possible to actually, you know, beyond a shadow of a doubt, as they say, describe how something like that happens. It's all timed

in milliseconds and could have taken any direction. It could have ricocheted off some other part of the gun. It may or may not have come as you described it. It may have. I am not saying it didn't."

[¶ 19] Faced with this evidence, the trial court was understandably equivocal in its description of the source and route of the metal fragment, finding "[t]he metal pieces which struck [Endresen's] face and eye may have been deflected backward off the inside surface of the trigger bar, but very likely could have also come from the top of the open chamber."

[¶ 20] Because the trial court failed to find a precise source and route of the metal fragment, Beretta asserts Endresen failed to prove proximate cause. But we have said proximate cause in a negligence case may be proved by circumstantial evidence if the evidence permits a reasonable inference of a cause of injury for which the defendant is responsible and excludes equally reasonable inferences of other causes for which the defendant is not responsible. *See Victory Park Apartments, Inc. v. Axelson*, 367 N.W.2d 155, 164 (N.D.1985); *Leno v. Ehli*, 339 N.W.2d 92, 96 (N.D.1983); *Farmers Home Mut. Ins. Co. v. Grand Forks Implement Co.*, 79 N.D. 177, 55 N.W.2d 315, 318 (1952); *Burt v. Lake Region Flying Service*, 78 N.D. 928, 54 N.W.2d 339, 347 (1952). Circumstantial evidence will also suffice to prove proximate cause in a products liability case. *See* 2 J. Lee and B. Lindahl, *Modern Tort Law* §§ 27.31 and 27.83 (Rev. ed.1990). *Cf. Stewart v. Ford Motor Co.*, 553 F.2d 130, 139 (D.C.Cir.1977) (where driver was not drunk, drugged, or suffering a diabetic reaction, car was not speeding, road conditions were good, there had not been a sudden blowout, car was only 12 days old and traveled 150 feet in a straight line before leaving the ground, "[p]laintiffs were entitled to ask the jury to infer that the accident was caused by some unknown defect which caused the steering system to malfunction"); *Cornell Drilling Co. v. Ford Motor Co.*, 241 Pa.Super. 129, 359 A.2d 822, 828 (1976) (where fire occurred in truck soon after it was purchased and it had been driven only 35 miles, fire

originated in cab and engine areas of truck, witnesses testified they did not cause fire and did not observe anything to lead them to believe someone else caused fire, and there was no evidence of any external cause for fire, "a reasonable jury could have inferred from the facts and circumstances that the Ford truck was in a defective condition at the time it left Ford's control"), *overruled on other grounds by REM Coal Company, Inc. v. Clark Equipment Co.*, 386 Pa.Super. 401, 563 A.2d 128, 134 n. 5 (1989).

[¶ 21] Here, the evidence before the trial court included Endresen's description of the incident in which, immediately after shooting the gun, he saw a "bright flash" followed by his eye going "black." There is medical testimony that "a piece of metal, very sharp and obviously at high speed, penetrated [Endresen's] right eye" and "came to rest behind the retina." The parties stipulated Endresen was without fault and did not contribute to his injury. Berg testified the Model 92F is defectively designed to adequately handle overloaded, reloaded cartridges, and such a cartridge was present in this case. Regardless of the precise source and route of the metal fragment, the evidence supports a reasonable inference, while excluding other equally reasonable inferences of other causes, that Endresen's injury would not have occurred if the Model 92F were properly designed.

[¶ 22] We conclude the trial court's finding that Endresen's injury was proximately caused by the combination of an overloaded cartridge and a defectively designed handgun is not clearly erroneous.

C

[¶ 23] Beretta asserts the trial court's finding that cartridge casings become weakened by excessive reloading is clearly erroneous. Beretta claims the evidence only supports a finding that the shell was weakened by "cold shut," which is a rare weakening caused by the original manufacturing process. This finding is crucial to whether the Model 92F is unreasonably dangerous, according to Beretta, because the odds of simultaneously having cold shut and an overload in one shell are so "astronomical," the

Model 92F cannot be considered unreasonably dangerous for not preventing this injury.

[¶ 24] A metallurgist examined the cartridge and concluded there was a cold shut. Berg testified he "certainly wouldn't dispute that" conclusion. Beretta's expert, Wood, on direct examination by its attorney testified about what he noted and put in his report when he examined the shell:

"A ... That particular cartridge case as I understand it was a reloaded cartridge and it appeared to be a very tired looking case. It may have been reloaded several times. I don't know. This I am just guessing from looking at the shape and condition of it. The brass appeared to be thinned. Thinner than it should be in the area of the break which may mean that there was some internal erosion perhaps from prior fires. I don't know this now, I am doing a lot of sort of speculation just based on what I saw."

Beretta's attorney got Wood to agree he was not a metallurgist and, later, upon questioning by Endresen's attorney, said he was not qualified to give an opinion on whether a cold shut occurred. Upon questioning by the trial court, Wood said his prior description of the casing as "tired" was "sheer speculation or a wild guess because I didn't mean to imply that I had any knowledge of by looking at it of how many times it had been fired." In an amended memorandum opinion, the trial court noted:

"Although the court has before it only speculation about the cold shut phenomenon, evidence was also presented that, when ammunition is 'remanufactured' or 'reloaded', there is a slight stretching and weakening of the shell casing as explained by Mr. Wood's observation that the segments of casing examined by him appeared to have been reloaded several times and was thinner than usual."

[¶ 25] A court properly receives testimony if neither a timely objection nor a motion to strike the testimony from the record is made. *See In re J.Z.*, 190 N.W.2d 27, 32 (N.D.1971). Opinion evidence, which would be inadmissible if objected to, may have probative force if received without objection, leaving the question of its weight and credibility to the trier of fact. *See McNab v. Jeppesen*, 258 Minn. 15, 102 N.W.2d 709, 712 (1960); *Uryasz v. Archbishop Bergan Mercy Hosp.*, 230 Neb. 323, 431 N.W.2d 617, 623–624 (1988). Here, the trial court found Wood's unobjected-to opinion of the weakened cartridge more probative than that of the metallurgist. A choice between two permissible views of the weight of the evidence is not clearly erroneous. *Buzick v. Buzick*, 542 N.W.2d 756, 758 (N.D.1996). We conclude the trial court did not err in refusing to find that the shell was weakened by cold shut.

D

[¶ 26] Beretta asserts the trial court's finding the Model 92F is unreasonably dangerous is clearly erroneous under North Dakota law because Endresen should have had knowledge that fragments from a rare rupture could strike his face. Under N.D.C.C. § 28–01.3–01(4), an "unreasonably dangerous" product is defined as:

"dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses, together with any actual knowledge, training, or experience possessed by that particular buyer, user, or consumer."

Endresen acknowledged he had been provided and had read when he purchased the pistol a booklet by the Sporting Arms and Ammunition Manufacturers Institutes, Inc., cautioning "twigs, falling shot, clay target chips and the rare rupture case may cause objects to be blown back toward the face of the shooter." Beretta therefore claims Endresen had "actual knowledge" of the risk this injury could occur so the Model 92F cannot be considered unreasonably dangerous under the statute.

[¶ 27] Although the trial court made no specific findings on this issue, because the court did find the Model 92F unreasonably dangerous, we assume the court implicitly found Endresen had no actual knowledge

this type of injury could occur. We cannot say the trial court's implicit finding is clearly erroneous.

[¶ 28] Manufacturers of hand guns have been held to the most exacting duty of care in the design of their product. *See Johnson v. Colt Industries Operating Corp.,* 797 F.2d 1530, 1535–1536 (10th Cir.1986) (applying Kansas law). The cautionary language relied on by Beretta did not convey a warning that anything would be "blown back" forcefully enough to cause a serious injury. Moreover, the trial court could reasonably find a generic warning from a group of weapon manufacturers of the possibility that a rare rupture could cause objects to be blown back to the shooter's face would not give Endresen actual knowledge that this type of accident could occur with a Beretta Model 92F. This is especially so in view of the record evidence, relied on and repeatedly stressed to the trial court by Beretta, that the Model 92F is considered the "best handgun available" and has a worldwide reputation for "safety and reliability."

[¶ 29] We conclude the trial court's finding the Model 92F is unreasonably dangerous under North Dakota law is not clearly erroneous.

## E

[¶ 30] Beretta asserts the trial court's finding the pistol is unreasonably dangerous is clearly erroneous because the court failed to use a risk-utility analysis and properly balance the benefits of the challenged design against the risk of danger inherent in the design. According to Beretta, because handguns are used for self-protection and functional reliability is vital to users who depend on the gun as a means to prevent harm, reliability is the equivalent of safety. Beretta asserts military testing proves the Model 92F is the most reliable semi-automatic 9mm handgun in the world and that reliability is due to its feed ramp design, which provides a flawless means of feeding shells into the firing chamber. According to Beretta, the trial court "failed to balance the damage to one eye in the past 20 years, compared to numerous injuries or deaths which may result when other less reliable feed ramp designs malfunction."

[¶ 31] We disagree with Beretta's argument. First, the most common risk-utility analysis in products liability actions involving handguns is the theory that the societal risks of injury inherent in the gun outweigh the societal benefits of the product. *See, e.g., Shipman v. Jennings Firearms, Inc.,* 791 F.2d 1532, 1533 (11th Cir.1986) (applying Florida law); *Moore v. R.G. Industries, Inc.,* 789 F.2d 1326, 1327 (9th Cir.1986) (applying California law); *Perkins v. F.I.E. Corp.,* 762 F.2d 1250, 1272 (5th Cir.1985) (applying Louisiana law). Beretta's argument seems to assume self-protection is the only beneficial use of a handgun. But, as evidenced by Endresen's use of the pistol when the accident occurred, self-protection is not the only purpose for purchasing and using a handgun. "Handguns are collected as a hobby and are used for target shooting and hunting, as well as for self-defense." Note, *Handguns and Products Liability,* 97 Harv.L.Rev.1912, 1915 (1984) (footnote omitted). Recreation and self-protection are both beneficial uses of a handgun. *See Moore.* The risk-utility analysis proposed by Beretta pits the safety of one group of beneficial users of handguns against the safety of another.

[¶ 32] Moreover, the trial court did perform the risk-utility analysis urged by Beretta but concluded functional reliability did not outweigh the risks inherent to recreational users of reloaded ammunition:

"Beretta has designed a very reliable pistol which is capable of functioning under a variety of adverse conditions. The design of a loading ramp part way into the bullet chamber likely has contributed to the pistol's reliable functioning. It appears that in designing the loading ramp into the bullet chamber, Beretta may have compromised the safety of persons using remanufactured and reloaded ammunition in order to increase operational reliability. Although there was some dispute about the extent to which a loading ramp has been designed into some of the products of other manufacturers, it can be reasonably concluded that alternative designs are feasible which better support the shell cas-

ing. The availability of an alternative design is of significance to the safety of persons using remanufactured ammunition."

*See also Sturm, Ruger & Co., Inc. v. Day,* 594 P.2d 38, 45–46 (Alaska 1979) (holding risk of danger to recreational user inherent in design of handgun outweighed benefits of the design), *cert. denied,* 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981), *overruled on other grounds Dura Corp. v. Harned,* 703 P.2d 396, 405 n. 5 (Alaska 1985).

[¶ 33] We agree with the trial court that the benefit of the design of the Model 92F to persons who purchase handguns for self-protection does not outweigh the risk of danger inherent in the design to persons who purchase and use the handgun with reloaded ammunition for recreational purposes.

## II

[¶ 34] Beretta asserts the trial court erred in holding it responsible for 100 percent of Endresen's damages when the court found it only 50 percent at fault. The trial court found the injury to be proximately caused by the combination of an overloaded cartridge and a defectively designed gun in equal proportion. Because there is an irreconcilable inconsistency in the findings over the total amount of Endresen's damages, we reverse and remand for clarification.

[¶ 35] The trial court ordered judgment against Beretta for $193,781.83 "as [Beretta's] share of the damages suffered by [Endresen]...." In its findings, however, the trial court specifically found the total amount of medical and related expenses incurred by

Endresen was $38,781.83 and the total amount of his loss of productive time was $5,000, both of which are included in the $193,781.83 figure ordered as Beretta's "share of the damages" suffered by Endresen. Under N.D.C.C. § 32–03.2–02, a person who contributes to an injury is only responsible for the percentage of damages equal to that person's percentage of fault. Beretta would be entitled to have Endresen's total damages reduced by that portion of fault attributable to the settling defendants. *See generally Hoerr v. Northfield Foundry and Mach. Co.,* 376 N.W.2d 323, 332 (N.D.1985). We are unable to determine from the findings whether the law has been properly followed in this case. Because of the inconsistency between the findings and order for judgment, we reverse and remand for clarification of the damages.

[¶ 36] Accordingly, we affirm the judgment as to liability, but reverse and remand for clarification of the damages.

[¶ 37] VANDE WALLE, C.J., MARING and SANDSTROM, JJ., and JOEL D. MEDD, District Judge, concur.

[¶ 38] JOEL D. MEDD, District Judge, sitting in place of MESCHKE, J., disqualified.