**Junior P. CLASSEN, et al., Appellants,**

v.

**REMINGTON ARMS COMPANY, Respondent.**

**No. C3–85–657.**

Court of Appeals of Minnesota.

Dec. 17, 1985.

J. Richard Baldwin, St. Paul, for appellants.

Robert T. Stich, Minneapolis, for respondent.

Heard, considered and decided by HUSPENI, P.J., and FOLEY and FORSBERG, JJ.

## OPINION

HUSPENI, Judge.

Appellants Junior P. Classen and his wife Elvera Classen brought a strict liability action against respondent Remington Arms Company, Inc. (Remington) to recover the damages they suffered as a result of an accident which occurred when a shotgun exploded and injured Junior Classen. The jury determined that Remington did not manufacture the gun shell which caused Classen's injuries. The trial court denied Classens' motions for judgment notwithstanding the verdict or, in the alternative, a new trial. The Classens appeal. We affirm.

## FACTS

This action arises out of an October 2, 1975, hunting accident. Classen was goose hunting with a .10–gauge Richland "over and under" shotgun. After spotting some geese, Classen fired two rounds. Classen then broke his gun, removed the two expended shells and put a third round into the gun. He did not actually examine the shell before he loaded it. When he fired the gun, it exploded and his left arm was severely injured.

It is undisputed that the accident was caused by an overpressurized defective shotgun shell. A shotgun shell can be overpressurized if the wrong type of gunpowder is used or if too much powder or

shot is used. The only disputed issue at trial was who manufactured the shell. Classen claims that the defective shell was manufactured by Remington.

This case has been tried twice. After the first trial, the jury determined that Remington did not manufacture the defective shell. The trial court granted a new trial based on newly discovered evidence, an unjustified verdict and jury misconduct.

At the second trial from which the Classens now appeal, Classen testified that the defective shell was from a Remington box of shells which he had bought the day before the accident from his hunting companion, Robert Schumacher. He testified that the only .10–gauge shells he had in his hunting jacket at the time of the accident were the Remington shells he had purchased from Schumacher. Various parts of the gun were recovered after the accident. The remains of the exploded shell, however, were not recovered.

Schumacher testified by deposition that he had bought two boxes of Remington .10–gauge magnum shells at a K–Mart in Sioux Falls, South Dakota and he sold one of those boxes to Classen the day before the accident. Schumacher did not have any trouble with his box of shells.

At one time, Schumacher reloaded .10–gauge shotgun shells, but he testified that he had not reloaded any .10–gauge shotgun shells for several years prior to the accident. Classen testified that he did not reload any .10–gauge shotgun shells until after the accident.

The phrase "Two Shot" was written on the end flap of the Remington box. It is common practice for persons who reload shells to use empty shell boxes for storing reloaded shells and to mark the boxes to identify the type of reloaded shells that are in the box. Classen testified that it is his practice to mark each reloaded shell, rather than the box itself.

Both parties offered detailed expert testimony about the defective shell and about shotgun shell manufacturing and reloading. The Classens' expert, Stanton Berg,

testified about how a shell with the wrong type of gunpowder or with too much powder or shot could be manufactured. Berg had never observed a Remington plant in operation, but he had observed other ammunition manufacturing plants. Berg testified about and showed slides of deformed manufactured shells which had passed through both mechanical and visual inspections. In particular, two defective .22–caliber shells were admitted into evidence. Those two shells were included in a box of Remington shells that Berg had bought for testing purposes. The trial court also admitted into evidence two defective Remington .12–gauge shotgun shells. Berg testified that the quality inspection process for all types of ammunition is the same.

While Berg was testifying, the Classens sought to introduce evidence regarding Berg's knowledge of recalls of Remington ammunition. Remington initiated these recalls as a result of its concern that the ammunition was overpressurized. Berg had records of six Remington ammunition recalls spanning a period of time from 1970 through 1983. The ammunition recalls all dealt with rifle or revolver ammunition, not shotgun ammunition. The trial court did not allow this testimony into evidence.

A normal factory-loaded shotgun shell produces approximately 10,000 to 12,000 pounds of pressure per square inch. Classen's gun was safe up to 17,600 pounds of pressure per square inch. Berg testified that, pursuant to his mathematical calculations, between 21,000 to 22,300 pounds of pressure per square inch was necessary to cause the destruction that occurred to Classen's gun.

In the first trial, Berg testified that the pressure necessary to cause the accident was approximately 50,000 pounds per square inch. On cross-examination in the second trial, Berg explained the difference in his testimony based on the fact that he changed his formula for making the calculation. He testified that the formula he used to make his estimate at the second trial is the correct formula and the previous formula was incorrect.

John Chisnall, a consultant for Remington, and Colonel Edward Crossman, Remington's expert, testified for Remington regarding the company's manufacturing process and the experiments they conducted in an effort to determine the cause of the explosion of Classen's gun. Chisnall and Crossman both testified that trying to duplicate a shotgun blast is the accepted method in the firearms industry for investigating such an incident. In an attempt to duplicate the shotgun blast, Remington purchased a few guns similar to Classen's gun. Remington has testing rooms specifically set up for these types of tests and it has a method for measuring the pressure in a gun.

Chisnall and Crossman determined that 65,000 pounds of pressure per square inch was required to cause the kind of destruction that occurred to Classen's gun. In order to produce this kind of pressure, they had to hand load a shell with a double load of shotgun powder. Crossman testified that the powder they used is not the same kind of powder that is used in manufactured .10–gauge shells. Rather, it is a powder commonly used for reloading. The shell with a double load of powder bulged badly. Crossman opined that the normal pressure produced by a factory-loaded .10–gauge shell (10,000–12,000 pounds of pressure per square inch) could not have caused the damage that occurred to Classen's gun. Remington submitted the remains of the test gun into evidence.

Spencer Wildman, an employee of Remington, testified regarding Remington's manufacturing process. He testified that, based on the code number printed on the end flap of the shell box, the box of shells was produced on May 3, 1973, on Remington's loading machine number thirty-eight. The report of the safety tests conducted on the .10–gauge shotgun shells produced on that machine on May 3, 1973, were submitted into evidence. There were no shell defects recorded that day. Wildman further testified that he did not know of any

way that only one defective shell could be manufactured.

The jury found that Remington did not manufacture the defective shell that exploded in Classen's gun. The jury found that Junior Classen had incurred damages of $150,000 and Elvera Classen had incurred damages of $50,000.

**ISSUE**

Did the trial court abuse its discretion in excluding evidence of Remington's ammunition recalls?

**ANALYSIS**

The Classens argue that the trial court erroneously excluded evidence of the Remington recalls. The Classens claim that this evidence constituted an admission by Remington that its manufacturing process was not foolproof and it also impeached Remington's witnesses who testified that its manufacturing process could not have produced one defective shell. The Classens contend that the recall evidence would have demonstrated that Remington's manufacturing system was not as reliable as Remington's witnesses suggested.

Our standard of review of evidentiary rulings is narrow. Evidentiary rulings on materiality, remoteness, or relevancy are committed to the sound discretion of the trial court and those rulings will only be reversed when that discretion has been clearly abused. *Jenson v. Touche Ross & Co.,* 335 N.W.2d 720, 725 (Minn.1983). We find no such abuse here.

The trial court excluded the recall evidence on the grounds that (1) the evidence does not show that Remington manufactured the defective shell in this case, and (2) admitting evidence of recalls may discourage companies from recalling defective and unsafe products. In making its ruling, the trial court appeared to rely upon both Minn.R.Evid. 403 and 407.[1]

Minn.R.Evid. 403 provides:

**1.** Minn.R.Evid. 407 provides that evidence of subsequent remedial measures is not admissible

to establish negligence or culpable conduct. We do not address the trial court's apparent re-

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Minn.R.Evid. 403.

Admittedly, the recall evidence does have some probative value since it challenges Remington's position that its manufacturing process could not produce one defective shotgun shell. The evidence does show that on six occasions Remington has been concerned that it may have produced defective ammunition.

The recall evidence, however, was not the only evidence of defective Remington shells. Even though Berg was not permitted to testify about the recalls, he did testify about defective Remington shells which had passed through quality inspections and those defective shells were admitted into evidence. This testimony and evidence challenged Remington's position that its manufacturing process was infallible.

Further, any probative value of the recall evidence is diminished by the fact that the recalled ammunition was not shotgun ammunition and was manufactured at a plant different than the plant which manufactured the .10–gauge shotgun shells involved in this case. Despite Berg's testimony that all ammunition manufacturing processes have similar quality inspections, the trial court correctly reasoned that the recall evidence is not very probative of whether the particular shotgun shell in Classen's gun was defective. In addition, the recall evidence would have probably required detailed explanation of the circumstances surrounding the recalls. We conclude that the slight probative value of the recall evidence was outweighed by the fact fact that the evidence would have required proof of peripheral matters and the risk that the evidence may have confused or prejudiced the jury.

Based on these considerations, we do not believe that it was an abuse of the trial court's discretion to exclude the recall evidence.

## DECISION

The trial court did not abuse its discretion in excluding evidence of Remington's ammunition recalls.

Affirmed.

liance on Minn.R.Evid. 407, since we conclude that the trial court did not abuse its discretion in excluding the recall evidence under Minn.R. Evid. 403.