In the Matter of the Estate of John J. FLAHERTY, Deceased.

John H. FLAHERTY, Jr., Plaintiff and Appellee,

v.

Norine FELDNER, Personal Representative of the Estate of John J. Flaherty, Deceased, Defendant and Appellant.

Civ. No. 880358.

Supreme Court of North Dakota.

Sept. 26, 1989.

Eaton, Van de Streek & Ward, Minot, for plaintiff and appellee, argued by Michael Ward, Minot.

Richard L. Schnell (argued), Mandan, for defendant and appellant.

McGee, Hankla, Backes & Wheeler, Ltd., Minot, for defendant and appellant, argued by Orlin W. Backes, Minot.

MESCHKE, Justice.

Norine Feldner was the principal beneficiary of the will of her brother, John J. Flaherty, deceased. She appealed from a jury verdict and judgment declaring that his will was an invalid product of an insane delusion. We affirm.

### FACTS

John J. Flaherty and Bessie Rock met at a dance in the summer of 1937 when he was 32 and she was 18. Bessie testified that John J. was her first date and her first sexual partner. Bessie became pregnant. John J. and Bessie married and moved in with his parents, Martin and Emma, on March 21, 1938. John H. Flaherty, son of John J. and Bessie, was born on April 12, 1938.

After that, Bessie and the baby slept in John J.'s room, but John J. slept in Emma's room while Martin slept on the couch. Emma insisted on this arrangement because she did not want Bessie and John J. sleeping together. Emma also insisted that John J. not play with the baby nor help care for him.

When John H. was three months old, John J. took Bessie and the baby to her parents' home, saying that he would get them in about a week. John J. never returned for Bessie and John H.

Bessie wrote several letters to John J. His only response was a request for blood tests when the baby was about six months old. The tests showed that John J. and Bessie had type A positive blood and that their baby, John H., had type O positive. By medical standards of that time, these blood types evidenced that John J. could have been the father of John H.

In 1939, John J. sued for an annulment. Bessie sought child support. Eventually, in 1941, Bessie gave up and agreed to annulment of their marriage.

When John H. grew up, he unsuccessfully tried to communicate with John J. John H., his wife, and children would sometimes visit John J.'s sister, Violet, in a nursing home. Although other relatives of John J. encouraged these visits, they disturbed John J. Also, at several chance meetings, John J. ranted to John H.'s wife and to his daughter because he felt their presence implied that he was father of John H.

John J. began telling people that he could not possibly be John H.'s father. Over the years, John J. claimed that he had never been married to Bessie, that blood tests proved he was not the father, and that he had used a white handkerchief as a contraceptive. In his lifetime, John J. wrote four different wills, each making his sister, Norine Feldner, beneficiary of nearly half of his estate. Also, each of these wills expressly disinherited John H.

When John J. died in 1986, John H. contested the wills, claiming they were invalid because John J. had an insane delusion that John H. was not his son. The trial court dismissed the contest petition, believing that the 1941 annulment judgment "established that [John H.] was not the son of [John J.]." John H. appealed. We reversed, ruling that John H. was not a party to the 1941 annulment and "his interests were not represented therein." *Flaherty v. Feldner,* 419 N.W.2d 908, 910 (N.D. 1988). Res judicata did not bar John H.'s rights.

At the jury trial on remand, a psychiatric expert for John H. testified that John J. was suffering from a "induced psychotic

disorder" or "shared paranoid delusion," a form of double insanity where a dominant person develops an insane delusion and passes it on to a submissive partner. This expert testified that John J. was dominated by Emma, his mother, that she developed and gave him the delusion that John H. was not his son, and that, after his mother's death, out of loyalty to her, John J. continued to reject his son.

Another psychiatric expert, testifying for Feldner, rejected the idea of a "shared paranoid delusion" because the disorder was so rare and because all of its traits did not seem clearly present in John J.'s relationship with Emma, his mother. This expert suggested that the annulment and rumors may have given John J. some basis for his belief.[1]

The jury decided that John H. was John J.'s son and that John J. had an insane delusion that he was not. The trial court entered a judgment declaring that all four wills were invalid and that John H. was John J.'s son and sole heir.

Feldner appealed. She claimed that the trial court mistakenly instructed the jury about an insane delusion and about the presumption of sanity, that the trial court erred in allowing and excluding evidence, and that there was insufficient evidence of an insane delusion shared between John J. and Emma, his mother.

## INSANE DELUSION

The trial court did not give, verbatim, a lengthy instruction requested by Feldner:

"There is a presumption that a testator was sane at the time of the execution of his will. Where one is contesting proof of a will on the basis that the testator was suffering from an insane delusion, it is not sufficient to introduce evidence which tends to prove the testator was possessed of such a delusion, there must

be further proof by the contestant that the delusion has no foundation in fact or in probability in order to show that the delusion is wholly a product of the imagination.

"Therefore, you are instructed that if there is any evidence, although slight or inconclusive, which may have contributed to John J. Flaherty's beliefs regarding John H. Flaherty, Jr. and his reasons for omitting him from his Will, the testator's belief is not a delusion. The question of whether John H. Flaherty, Jr. is the testator's son is not an issue with regards to determining whether the testator suffered from an insane delusion, because regardless of whether or not John H. Flaherty, Jr. was actually his son, the issue is whether or not there was any evidence which may have contributed to the testator's belief for omitting him from the Will.

"Furthermore, you are instructed that in addition to proving that the testator suffered from an insane delusion, it is not enough that the contestant prove that the testator was a victim of such delusion, the contestant must also prove that the Will itself was a product of that delusion and that the testator divides up his property in a way which, except for that delusion, he would not have done.

"Therefore, to invalidate this Will on the basis that it was a product of an insane delusion, the contestant must prove all of the following facts:

"1. That John J. Flaherty suffered from a delusion that had no foundation in fact or probability, and was wholly a product of imagination;

"2. That John J. Flaherty suffered from this delusion at the time he signed the Will;

---

**1.** Evidence of rumors was sketchy. Only John J.'s sister, Norine Feldner, who would receive half of John J.'s property under the will, testified about a rumor. She said that a friend of her late husband's once told him in a vague reference to the mail carrier and Bessie, "John had better kinda watch his step cause she was out to get him." But Feldner had been unable to recall any rumors at her deposition before trial. Bessie admitted having danced with the mail carrier and others at public dances with John J.'s knowledge, but denied having sex with anyone other than John J. A non-party witness who knew the family at that time could not recall any rumors.

"3. That he would not have drafted his Will in this manner, except for the delusion."

Instead, the trial court instructed on the nature of an insane delusion, as follows:

"An insane delusion is insanity upon a single subject. An insane delusion renders the person afflicted incapable of reasoning upon that particular subject. He assumes to believe that to be true which has no reasonable foundation in fact on which to base his belief. A person persistently believing supposed facts which have no real existence against all evidence and probability, and conducting himself upon the assumption of their existence, is so far as such facts are concerned, under an insane delusion.

"An insane delusion may exist even though there was some evidence from which the person afflicted might have formed his belief of judgment. It is a belief which is not based upon reasonable evidence, or at least without any evidence from which a sane man could draw the conclusion which form the delusion."

The trial court also instructed on the burden of proof for an insane delusion:

"The Will contestant has the burden of establishing by a greater weight of evidence that the testator suffered under an insane delusion. Whether a testator is laboring under an insane delusion which materially affects the will is generally a question of fact, and to defeat a will on the ground that the testator lacked testamentary capacity because of an insane delusion, it is not sufficient to establish that the testator was the victim of such a delusion, but the evidence must go further and establish that the will itself was the product of that delusion and that the testator devised his property in a way which, except for that delusion, he would not have done."

Relying on language of prior decisions by this court, Feldner argued that there were errors in the trial court's instructions about an insane delusion. First, Feldner complained that the trial court did not instruct, as she requested, that:

"If there was *any* evidence, even though slight or inconclusive which may have contributed to the belief held by one claimed to be afflicted with the delusion, then his belief cannot be said to be a delusion." (Feldner's emphasis).

Second, Feldner complained that trial court did not instruct, as she requested, that a belief must be "wholly a product of the imagination" to be a delusion. Third, Feldner complained that the trial court misstated the law by instructing that "an insane delusion may exist even though there was *some* evidence from which the person afflicted might have formed his belief of judgment." Fourth, Feldner complained that the trial court improperly instructed that a decedent must base his operative beliefs on "reasonable" evidence. Recapping, Feldner's arguments all addressed the definition of an insane delusion which can affect testamentary capacity and destroy the ability to make a valid will.

John H. responded that the elaborate instruction requested by Feldner would have distorted the law on testamentary capacity and would have been equivalent to a directed verdict upholding the wills. John H. insisted that the trial court's instruction was a more accurate statement of the law and that any error or omission in the trial court's instruction was harmless.

■ We review claims of error in jury instructions with respect for the language, form and style of the trial court's formulations, " 'so long as they fully and fairly inform the jury of the rules and principles of law applicable to the case and are plain, simple, and easily understood by the jury.' " *Wasem v. Laskowski,* 274 N.W.2d 219, 223 (N.D.1979).

"There is no need for us to consider the requested instructions ... if, based on the evidence adduced, the instructions given, when considered together, correctly advise the jury as to the law applicable to the case. Under such circumstances there was no error even though the requested instructions, which were refused, were correct statements of the law. [Citations omitted]."

*Munro v. Privratsky*, 209 N.W.2d 745, 750 (N.D.1973). *See also Jore v. Saturday Night Club, Inc.*, 227 N.W.2d 889, 894 (N.D.1975) ("A trial court may properly refuse tendered instructions which are covered by instructions given on its own motion."); *Haider v. Finken*, 239 N.W.2d 508, 512 (N.D.1976) ("[I]nstructions to the jury must be considered in their entirety. If the effect of the whole is to outline the issues in the case fairly and correctly, an isolated improper statement contained therein will not be considered prejudicial error."); *Sendelbach v. Grad*, 246 N.W.2d 496, 502 (N.D.1976) ("That language is unnecessary in light of the concise, clear instruction given."); *Wasem v. Laskowski, supra,* at 223 ("Even when an instruction is insufficient or erroneous standing alone, we would consider the apparent error cured if the instructions as a whole fairly advise the jury as to the law which pertains to the essential issues."); *McGarry v. Skogley*, 275 N.W.2d 321, 325–26 (N.D.1979) ("Even though we perhaps would not have composed an instruction in the language used by the trial judge, that is not a measure by which we determine the correctness of instructions."); *Gajewski v. Bratcher*, 307 N.W.2d 826, 832 (N.D.1981) ("If an instruction adequately covers the law, it is not error to refuse to give a requested instruction even though there was nothing objectionable in the requested instruction."). We accordingly evaluate the adequacy of the instructions given by the trial court in this case.

Four times, this court has decided how an insane delusion may affect a will. We summarize those decisions bearing on these instructions.

In *Edwardson v. Gerwien*, 171 N.W. 101 (N.D.1919), this court approved probate of a will over a claim that it was affected by an insane delusion. The claimants argued that the decedent falsely believed that certain relatives were trying to starve him and get his property away from him. Justice Grace, writing for four members of this court, assumed that the evidence demonstrated that the decedent so believed, but concluded that the evidence nevertheless fell short of an insane delusion. Justice Grace "endeavor[ed] to formulate the rule of proof that must be present to prove the actual existence of an insane delusion," ruling that opponents of the will had to prove that the belief "was in fact false; ... had no basis in fact, and [was] not founded in reason or probability; ... had no real existence, but [was] purely a product of the imagination." *Id.*, at 103.

> "[I]f there were any evidence, even though slight or inconclusive, which may have contributed to the belief held by one claimed to be afflicted with the delusion, then his belief cannot be said to be a delusion."

*Id.* The opinion ruled that some irrational conduct by the decedent, sleeping with his clothes on, staying in bed for two weeks, and not eating, which accompanied the claimed irrational belief, did not prove insanity. Justice Grace concluded that no delusion was proven. Without joining in the extensive dicta by Justice Grace, Chief Justice Christianson briefly concurred that the evidence and the findings of the trial court sustained the will.

Nearly a half-century later, in *Kingdon v. Sybrant*, 158 N.W.2d 863 (N.D.1968), this court reversed a jury verdict and judgment which held a will invalid for lack of testamentary capacity arising from an insane delusion that decedent's divorced wife had been unfaithful to him and that he was not the father of his daughter. This court ruled that jury instructions, directing that both chastity and legitimacy were presumed, improperly shifted the burden of proof to the proponents of the will. In effect, the instructions made it necessary for the proponents of the will to prove that decedent's former wife was unfaithful and that, therefore, the daughter was illegitimate. The court repeated the expression in *Edwardson v. Gerwien, supra,* that a will contestant must show that a "delusion has no foundation in fact or in probability, in order to show that the delusion is wholly a product of the imagination." 158 N.W.2d, at 866. The court also ruled that evidence of rumors about an affair between decedent's former wife and a named individual was admissible and relevant "in-

sofar as the presence of such rumors could have affected the decedent's belief and given substance thereto." *Id.,* at 868.

*In Re Estate of Rask,* 214 N.W.2d 525 (N.D.1974), affirmed a trial court decree denying probate of a will because the decedent was suffering from the insane delusion that the sole beneficiary was his daughter. In fact, decedent had never been married, had no children, and was not the father of the sole beneficiary. This court concluded that the evidence established that "there was no factual basis" for the decedent's belief.

*Matter of Estate of Koch,* 259 N.W.2d 655 (N.D.1977), also affirmed a trial court's decree denying probate of a will. The trial court determined that the will was produced by decedent's insane delusion that his children were against him. As in prior cases, this court viewed the matter as a question of fact and concluded that evidence supported the determination of the trial court. This court agreed with the trial court that conduct of decedent's children, in truthfully testifying against him in a mental health proceeding and in his divorce from their mother, was not a rational factual basis for the decedent's belief. This court used an analysis from similar decisions in other states that " '[t]here is no evidence from which a sane mind could draw the conclusion' " which the decedent insanely believed. 259 N.W.2d, at 662.

In sum, this court has sought to distinguish between mistaken beliefs not produced by mental illness, simply because they are based on evidence which is incomplete or misleading, and those irrational false beliefs produced by a mental illness.

"Everyone in life, at some time or another, holds some false beliefs, and frequently such false beliefs or delusions, as they may be called, are the basis of our action; but the mental attachment to the belief is one that is rational and will give way to superior evidence and is susceptible of correction. Such delusions, not being insane delusions, do not destroy testamentary capacity or render invalid a will based upon such delusions. An insane delusion, therefore, is more than just a mere delusion, a false belief, an eccentricity, a clash between two persons of different temperament or personality, or a religious or racial prejudice of ancestral origin. It is a delusion that is the product of a sick or diseased mind and that is held to without evidence or rational basis."

1 Bowe–Parker: *Page on Wills,* § 12.29, p. 631 (1960).

Many courts have struggled to adequately express this idea in defining an insane delusion to instruct a jury. *Id.,* at § 12.30. Our own expressions of this concept have progressed with our case-by-case experience. Generally, the better expressions have defined an insane delusion as a belief in facts that no rational person would believe, as not founded upon evidence, and as not removable by evidence. *See* 1 Bowe–Parker: *Page on Wills,* §§ 12.30–12.34. Essentially, that is what the trial court said in this case.

■ Taken as a whole, the trial court's instructions to the jury were accurate and complete. It is not just any evidence or some evidence which makes a belief rational, rather than delusionary. An insane delusion is a belief in "facts which have no real existence against all evidence and probability" as the trial court instructed. A delusion must be the "product of the imagination," as Feldner requested, but we think the trial court fairly stated that element in instructing that a delusion must be a belief "without any evidence from which a sane man could draw the conclusion...." Nor do we think it was error to instruct that an insane delusion may exist even though there was some evidence from which the decedent might have formed his belief, since the trial court clarified that it must be a belief of facts "which have no real existence" and which are "not based upon reasonable evidence" that a sane person would believe.

■ If jury instructions are correct, it is not error to refuse to give an additional instruction requested, even if the requested additional instruction is also correct. *Gajewski v. Bratcher, supra.* We conclude that, taken as a whole, the trial court's

instructions in this case fairly and fully informed the jury of the principles applicable to these facts.

## PRESUMPTION OF SANITY

Feldner requested the following instruction:

"Where a Will is contested on the grounds that the testator did not have sufficient mental capacity to make a Will, the Testator is presumed to have been sane and to have had testamentary capacity at the time the Will was signed.

"The presumption substitutes for evidence of the existence of testamentary capacity and governs you in finding testamentary capacity, unless you find from credible evidence that testamentary capacity does not exist, in which event the presumption is rebutted and ceases to operate. A party against whom a presumption is directed has the burden of proving that the nonexistence of the presumed fact is more probable than its existence."

Feldner argued that it was error for the trial court to refuse to so instruct that one who makes a will is presumed sane. John H. responded that this presumption was already a function of the burden of proof on the contestant as the trial court instructed. Therefore, John H. argued, under the North Dakota Rules of Evidence, no further instruction was called for.

Part of NDCC 30.1–15–07 says:

"Contestants of a will have the burden of establishing lack of testamentary intent or capacity, ..." .

NDREv 301 says:

"A party against whom a presumption is directed has the burden of proving that the nonexistence of the presumed fact is more probable than its existence."

The trial court instructed:

"The Will contestant has the burden of establishing by a greater weight of evidence that the testator suffered under an insane delusion."

Since the trial court instructed that John H., as the person contesting the will, had the burden of proof, there was no error in declining to further instruct that there was a presumption of sanity. The burden of proof need not be doubly emphasized.

Feldner also requested an instruction that a person has a right to will property in any manner which the person chooses so long as public policy was not violated. The instruction requested said:

"Any competent adult individual may make a written testamentary disposition of his or her property to take effect upon his or her death. It is the testator's right. The testator may dispose of this property as he wishes without regard to the desires of prospective beneficiaries or the views of juries or courts. If the Will disregards family ties or is unwise or is unjust, or is, for other reasons, such as the court does not approve, this does not signify that it is invalid, as long as the Will is not against public policy. It is not against public policy to disinherit a son.

"One who makes such a disposition is called the 'testator', and the document the testator executes is called a 'Will'."

The trial court did not give the instruction as requested, but, as John H. pointed out, its substance was effectively given. The trial court instructed that the evidence must establish that "the testator divides up his property in a way which, except for that delusion, he would not have done." This instruction allowed the jury to find, if it had been so inclined, that in his right mind John J. would have disinherited John H., even if John H. were his son.

We conclude that there were no substantial errors in the trial court's instructions to the jury.

## EVIDENTIARY RULINGS

Feldner argued that it was error to allow her to be cross-examined about the fact that she was the surviving joint tenant with John J. on some bank accounts and certificates of deposit. The question was asked and answered before objection was made. Then, an objection was sustained and no further questions on this subject were asked. Since there was no motion to strike or request for a curative instruction, we find no abuse of discretion in the trial

court's ruling denying a mistrial for this singular irrelevant inquiry.

Feldner argued that the trial court erroneously permitted John H.'s psychiatric expert to testify that John J.'s rejection of John H. had a devastating effect on John H.'s life. John H. responded that Feldner's counsel opened the door to this line of examination by cross-examining about the subject of John J. rejecting his son all of his life. We see no abuse of discretion.

■ Finally, Feldner argued that it was error to not permit the evidentiary use of the judgment annulling the marriage of John J. Flaherty and Bessie Rock. John H. argued that it's probative value was outweighed by the danger of unfair prejudice, so that there was no abuse of discretion in its exclusion.

The annulment petition verified by John J. was received in evidence. So was the stipulation signed by both John J. and Bessie. A letter from Bessie's attorney to the attorney for John J. about completing the stipulation was also in evidence. Since we had already ruled that the judgment was not res judicata, *Flaherty v. Feldner, supra*, the relevancy of the judgment itself was marginal on the issue of an insane delusion. We see no abuse of discretion in not admitting it into evidence before the jury.

## SUFFICIENCY OF THE EVIDENCE

■ Feldner argued that John H. failed to prove elements of the specific insane delusion relied upon, an "induced psychotic disorder" or "shared paranoid delusion." Feldner directed our attention to the outline of this disorder given by John H.'s psychiatric expert:

1.  Emma suffered from the insane delusion that John H. was not John J.'s son and passed this delusion on to John H.;

2.  Emma was extremely dominant in her relationship with the submissive John J.; and

3.  This induced psychotic disorder usually dissipates when the relationship between the dominant person and the submissive person ends.

Feldner argued that there was insufficient evidence that Emma believed John H. was not John J.'s son, that Emma was insane, or that Emma dominated John J. In addition, Feldner pointed out that John H.'s psychiatric expert had never met either Emma or John J., so that he was expounding on their mental conditions without sufficient foundation in fact.

Pointing to testimony that John J. was an assertive person who made his own decisions and managed his own life, Feldner argued that the evidence demonstrated that Emma did not dominate John J. Coupled with a lack of any evidence about mental illness on the part of either Emma or John J., Feldner argued that the usual predicates for the rare induced psychotic disorder were not present. Moreover, since Emma died over 10 years before John J.'s last will, the usual dissipation of this rare disorder after termination of the relationship was not present.

As a legal matter, John H. only had to prove an insane delusion on the part of John J., the one who made the wills, not on the part of Emma, his mother. To the extent that John J.'s mental condition was affected by his relationship with his mother, we think there was sufficient evidence about Emma's dominance to fairly permit expert testimony on the subject.

According to testimony by Bessie, Emma insisted on strange sleeping arrangements in the Flaherty home after the baby was born. John J. no longer slept with his wife but shared a bed with his mother. At age 32, John J. complied.

There was evidence, through Bessie's testimony, that it was Emma who first suggested that the baby was not John J.'s. To begin with, John J. did not share this suspicion. He married Bessie; he named his boy; and he played with him. Emma insisted that John J. not even play with the baby, distorting a father's natural behavior.

This evidence was sufficient to infer that John J. was not willing to disagree with Emma, accepted her beliefs, and was dominated by her. This was sufficient predicate for an expert opinion. NDREv 703 says

that, "[t]he facts or data ... upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing."

## CONCLUSION

We conclude that there was sufficient evidence for the jury's verdict, that there was no error in allowing and excluding evidence, and that the jury was satisfactorily instructed. Because Feldner had a fair trial, we affirm.

ERICKSTAD, C.J., and LEVINE, J., concur.

VANDE WALLE, Justice, dissenting.

I take issue with the insertion of the standard of reasonableness in the trial court's instruction on insane delusion. A person may, unreasonably in the minds of other people, leave her or his property in a manner that others would not without suffering an insane delusion. The danger, of course, is that in the future a testator's orders as to the disposition of his or her property may be invalidated because a jury does not believe the testator disposed of his property "reasonably." We have not heretofore held that an unreasonable belief or a belief based on unreasonable evidence is the equivalent of an insane delusion.[1]

The issue is not insignificant. Presumably there is a difference between insanity and ignorance. A person in 1937 might have believed that a handkerchief was an adequate contraceptive. From what we are told about the ignorance particularly of young people today concerning these matters, it might even be true today. A person who believed that a handkerchief was an adequate contraceptive would surely hold an unreasonable belief, but would we necessarily conclude it was an insane delusion? Yet there is evidence in the record that John J. did use a handkerchief as a contra-

ceptive while having intercourse with Bessie. If he believed that John H. was not his son because he used the handkerchief as a contraceptive, is that not sufficient evidence to remove his belief from the realm of an insane delusion? Such a belief is surely born of ignorance and may, as the trial court instructed, "have no reasonable foundation in fact." But it would not be an insane delusion. It is for just such a reason that the interjection of a reasonableness standard into the definition of insane delusion is so fraught with danger.

Secondly, I believe the jury should be instructed that there is a presumption of sanity on the part of the testator. That is clearly the law in this State. E.g., *Kingdon v. Sybrant*, 158 N.W.2d 863 (N.D. 1968). Although, in our legal minds, we might deduce that a presumption of the testator's sanity exists when the trial court has instructed that the will contestant has the burden of establishing by a greater weight of the evidence that the testator suffered under an insane delusion, I am not convinced a jury of lay people will necessarily so infer. Because it is so clearly the law of this State that a presumption does exist, I believe Feldner was entitled to a specific instruction to that effect.

Finally, I do not agree with the majority that an instruction that the evidence must establish that "the testator divides up his property in a way which, except for that delusion, he would not have done" is the equivalent of an instruction that competent adults may dispose of their property as they wish without regard to the desires of prospective beneficiaries or the views of juries or courts. The majority concludes that the instruction given would allow the jury to find that in his right mind John J. would have disinherited John H. if John H. were his son. I do not agree; to the contrary, I believe it permits a jury to conclude, almost as a matter of law, that if

---

1. The majority opinion concludes that the trial court fairly stated that an insane delusion must be the "product of the imagination" when it instructed that a delusion must be a belief "without any evidence from which a sane man could draw the conclusion ..." But that is not the whole instruction and that portion of the

instruction is at best confusing insofar as it reads:

"It is a belief which is not based upon *reasonable* evidence, or *at least* without any evidence from which a sane man could draw the conclusion which form the delusion." [Emphasis supplied.]

John H. were John J.'s son, John J. would not disinherit him. As observed in my concurring opinion in *Flaherty v. Feldner*, 419 N.W.2d 908, 911 (N.D.1988) (VandeWalle, J., concurring in the result), there are parents who readily acknowledge their offspring but who disinherit those offspring.

The jury should not be left to infer from the instruction that it might find that if in his right mind John J. would have disinherited John H., even if John H. were his son. Feldner was entitled to an affirmative instruction as to the right of competent testators to dispose of their property as they desire. Furthermore, the instruction given is, I believe, confusing. It also permitted the jury to conclude that mentally competent persons would leave their property to their children and that because John J. did not leave his property to John H. he must have been incompetent. If testators are to be assured their estates will be distributed as they have legally dictated, the right to do so should not be compromised by instructions which leave the jury room to substitute its judgment as to how the property should be distributed for that of the testators.

The trial court was apparently concerned that both parties be permitted to advocate their positions without undue direction from the trial court. But our law clearly gives the testator the "edge" and the trial court should instruct accordingly. I am not anxious to set aside a jury verdict because of an erroneous instruction.[2] Jurors often arrive at what appear to be correct verdicts notwithstanding the instructions. However, I believe we should reverse the judgment in this instance. If we do not, I fear the instructions will become the model for future cases. Too often an instruction that barely passes appellate scrutiny is held out as the model for that reason when a more appropriate instruction would be preferable.

I would reverse the judgment and remand for a new trial at which the appropriate instructions could be given.

GIERKE, J., concurs.

2. My primary concern is with the instructions. However, if, as John H.'s expert witness testified, it was necessary for Emma to have suffered from an insane delusion and passed it to her son, John J., there is scant evidence in the record that Emma so suffered unless the jury is to conclude that any mother who attempts to come between her son and his wife so suffers. There is obvious evidence of Emma's dominance but little explanation for John J.'s continued denial of his parental status after her death. There is no evidence, expert or otherwise, that equates dominance of a married son by his mother with an insane delusion. Although the majority states that as a legal matter John H. only had to prove an insane delusion on the part of John J., that is disingenuous when the expert witness John H. relies upon for that proof espouses a theory that begins with an insane delusion on the part of Emma which she passes on to her son.