In the Matter of the ESTATE OF Ervin E. AUNE, Deceased.

Dwight AUNE and Gregg Aune, Petitioners and Appellants,

v.

FIRST NATIONAL BANK & TRUST OF WILLISTON, Personal Representative for the Estate of Ervin E. Aune, Respondent and Appellee.

Civ. No. 910020.

Supreme Court of North Dakota.

Dec. 9, 1991.

Janet Holter Zander of Anseth & Zander, Williston, for petitioners and appellants.

Donna M. Trotter of Winkjer, McKennett, Stenehhjem, Trotter & Reierson, Williston, for respondent and appellee.

David W. Nelson, Williston, Guardian ad Litem.

LEVINE, Justice.

Dwight and Gregg Aune appeal from a judgment admitting the will of their father, Ervin E. Aune, to probate after the county court rejected the theory that the will was the product of insane delusions. We affirm.

Ervin Aune and Cora Jean Aune were divorced in January of 1989 after thirty-one years of marriage. They had two children, Dwight and Gregg. Ervin executed a will on March 21, 1990. The will named First National Bank of Williston as personal representative and devised Ervin's entire estate in trust to six named grandchildren to be distributed when the youngest grandchild reached the age of thirty-five. The will excluded Dwight, Gregg and Gregg's illegitimate daughter. Ervin died of a self-inflicted gunshot wound in May 1990.

Dwight and Gregg objected to the probate of the will arguing that Ervin lacked testamentary capacity because he suffered from insane delusions when he executed the will. After a hearing to determine Ervin's testamentary capacity, the county court concluded that the contestants did not prove that Ervin suffered from insane delusions. Dwight and Gregg appealed.

Dwight and Gregg first argue that the trial court abused its discretion by excluding and not considering the testimony of their expert witness, Dr. Phillip Ruffalo. Dr. Ruffalo testified on direct examination as to his qualifications. He has been a board-certified surgeon since 1972, and before that time, he practiced general medicine and taught surgery. Since 1986, he had treated Ervin for physical ailments and nervousness, anxiety and job-related stress. For the emotional-distress symptoms, he recommended counseling and prescribed a low dosage of Valium.

After counsel for Dwight and Gregg questioned Dr. Ruffalo about his qualifications, he posed a hypothetical question which detailed behavior allegedly similar to the behavior Ervin had exhibited during the two years prior to the signing of his will and asked the Doctor if a person exhibiting such behavior suffered from insane delusions. Counsel for the Personal Repre-

sentative objected because of a lack of foundation qualifying Dr. Ruffalo as an expert. The court sustained the objection.

Counsel for Dwight and Gregg then attempted to lay further foundation to establish Dr. Ruffalo's qualifications to treat mental disorders. Dr. Ruffalo testified that although his specialty was general surgery, he also practiced family medicine. He testified that he was trained to understand and detect stress and examine patients as to mental capacity. He had treated over one hundred patients for mental problems throughout his career. He stated that, while treating Ervin for anxiety, he recommended hospitalization but Ervin refused. He testified that he was familiar with delusions and had treated patients with delusions. He believed himself qualified to give his opinion on whether a person was suffering from a delusion. Counsel for the Personal Representative renewed her objection. Counsel for Dwight and Gregg asked the trial court to admit the testimony and give it the weight it deemed appropriate. The court sustained the objection.

Counsel for Gregg and Dwight continued to attempt to qualify Dr. Ruffalo as an expert on the issue of insane delusions. The Doctor testified that he did not know if the legal profession interpreted the term "insane delusions" or "unsound mind" the same as the medical profession. Counsel for the Personal Representative again objected to Dr. Ruffalo's qualifications. The trial court again sustained the objection, stating that it was not aware of any authority which permitted a general surgeon, rather than a psychiatrist, to testify as to mental capacity. The Doctor was excused subject to being recalled.

The next day, counsel for Dwight and Gregg provided the court with case law authorizing an attesting witness to give opinion testimony as to the mental condition of a testator at the time of the execution of a will. Counsel argued that if a lay person could give an opinion on testamentary capacity, so could a medical doctor. Counsel for the Personal Representative renewed her objection but this time the

trial court overruled the objection and admitted the Doctor's testimony, saying:

"I was concerned yesterday about the attitude of Dr. Ruffalo and his lack of familiarity with some of the legal terms but he then said that he had worked with Attorney Anseth to better understand them and then he went on to say that he had worked extensively with delusions as a part of his surgical practice.... [I]t seems to me that Rule 702 [NDREv] is going to govern in this case. In the Munroe case [*Munro v. Privratsky,* 209 N.W.2d 745 (N.D.1973)] the witness there, not a doctor, but a professional witness there, the expert said it was hard for him to get an honest opinion, but the Court nonetheless let the testimony in.... In line with that decision and in line with the discretion that the Court is given I am going to permit the recall of Dr. Ruffalo, albeit reluctantly, I think instead it should have been a psychiatrist in this case but I am not going to preclude this testimony because it appears that it is what we have to work with and the doctor has stated he had experience in a large number of cases with the subject of insane delusions which appears to be the crux of the case here."

The Doctor was recalled and testified that, based upon the hypothetical question, it was his opinion, to a reasonable degree of medical certainty, that Ervin was "not in a stable state" and suffered from an insane delusion. However, on cross-examination, Dr. Ruffalo testified that, while treating Ervin, he could not and did not diagnose Ervin as suffering from insane delusions. Instead, Ervin's behavior only caused the Doctor to believe that, "at times," Ervin "was not looking out for his best interests." Further cross-examination highlighted Dr. Ruffalo's unfamiliarity with both the tests used to analyze competency and the Diagnostic and Statistical Manual for Mental Disorders (DSM III). Dr. Ruffalo also admitted that he was not qualified to administer tests to determine mental competency.

Notwithstanding the trial court's expression of its change of mind to allow admission of the Doctor's opinion testimony, and

notwithstanding the trial court's explanation for reversing its position and in effect, its "seeing the light" and allowing the opinion testimony, Dwight and Gregg nonetheless maintain that the trial court "excluded" the Doctor's testimony and "did not consider" it. For this argument, they rely on Finding 26, which says:

"Phillip J. Ruffalo, M.D. treated Ervin from July 7, 1980, [*sic*] to February 23, 1990, but based on his own observations, Dr. Ruffalo could not state Ervin was suffering from an insane delusion. Dr. Ruffalo did testify in response to a hypothetical question (Petitioner's Exhibit 4) that Ervin was suffering from an insane delusion at the time he signed his Will. Dr. Ruffalo is a highly qualified general surgeon. But, after reviewing his testimony in totality, the Court finds the question beyond the expertise of his qualifications."

The question is whether Finding 26 means that the trial court excluded and did not consider Dr. Ruffalo's testimony or admitted it into evidence, considered it but deemed it worthy of little or no weight.

In *Stillwell v. Cincinnati Inc.*, 336 N.W.2d 618 (N.D.1983), this court was presented with a similar dispute over whether a trial court excluded and did not consider expert testimony because of the expert's lack of qualifications. We reviewed the trial court's other findings of fact for clarification and concluded that the expert testimony had been considered. *Id.* Using the same method, we note that in Finding 27, the trial court specifically relies on Dr. Ruffalo's opinion. Finding 27 says: "Dr. Ruffalo agreed that if Ervin was angry at his sons for not bringing Cora Jean back, it would not be an insane delusion to omit them from the Will." Finding 27 counters the appellants' contention that the Doctor's testimony was excluded and not considered. Furthermore, Finding 26 reflects the trial court's skepticism over the inability or disinclination of Dr. Ruffalo to diagnose, from his own observations and treatment of Ervin, any insane delusions. It was only in response to a hypothetical

question that the Doctor diagnosed an insane delusion.

◼ A witness must be qualified as an expert before testifying, by opinion, as to "scientific, technical or other specialized knowledge." NDREv 702. It is the trial judge who determines the qualifications of an expert and that determination will not be reversed unless it constitutes an abuse of discretion. *Oberlander v. Oberlander*, 460 N.W.2d 400 (N.D.1990). Rule 701 envisions the "most generous allowance of the use of expert witnesses" but those witnesses must be "shown to have some degree of expertise in the field in which [they are] to testify." *Stein v. Ohlhauser*, 211 N.W.2d 737, 743 (N.D.1973). Under the rule, to be qualified as an expert witness, one need possess the requisite knowledge, skill, training or education in one's field. *Oberlander, supra; see also Collom v. Pierson*, 411 N.W.2d 92 (N.D.1987). While the trial judge decides the qualifications of a witness to express an opinion on a given topic, it is the trier of fact who determines the credibility of that expert witness and the weight to be given to the testimony of that expert. *Construction Assoc. v. Fargo Water Equip.*, 446 N.W.2d 237 (N.D.1989). *See also* 3 J. Weinstein, *Weinstein's Evidence* ¶ 702[04] (1991). Here, the trial judge was also the trier of fact.

◼ We believe the trial court allowed Dr. Ruffalo's expert opinion into evidence in accordance with Rule 702 of the North Dakota Rules of Evidence. It acknowledged the Doctor's general experience and medical knowledge. We also believe that the trial court, as fact finder and arbiter of the weight to be given to the expert testimony, deemed Dr. Ruffalo's testimony on the issue of insane delusions of little substance, partly because he was not a psychiatrist, and partly because he did not diagnose such a condition when treating and observing Ervin in the weeks, months and years preceding the execution of Ervin's will. As fact finder, the trial court was entitled to weigh the expert testimony and evaluate it. Indeed, as fact finder, the court did not have to accept the expert opinion even though the opinion was undisputed. *E.g., Gardebring v. Rizzo*, 269 N.W.2d 104 (N.D.1978). Of course, psychiatric testimony is critical in proceedings where liberty is at stake. *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); *In re Interest of Goodwin*, 366 N.W.2d 809 (N.D.1985); *see also* NDCC § 25–03.1–02(5). We are unable to fault a trial judge for deeming psychiatric testimony weightier than other expert testimony in resolving the issue of whether a testator suffered insane delusions. We conclude that the trial court considered Dr. Ruffalo's expert testimony and gave it the weight it deemed appropriate.

◼ Dwight and Gregg next argue that the trial court's findings that support the conclusion that they did not prove that Ervin suffered from insane delusions were clearly erroneous under Rule 52(a), NDRCivP. A finding of fact that comports with one of two permissible views of the evidence is not clearly erroneous. *Lang v. Wonnenberg*, 455 N.W.2d 832 (N.D.1990).

◼ Under NDCC § 30.1–15–07, the contestants of a will have the burden of proving lack of testamentary capacity. *Matter of Estate of Papineau*, 396 N.W.2d 735 (N.D.1986). The question of whether a testator was suffering from an insane delusion which materially affected the will is a question of fact. *Matter of Estate of Koch*, 259 N.W.2d 655 (N.D.1977). The contestants must establish that the will was a product of the insane delusion and that the testator, if not laboring under the insane delusion, would have differently devised the property. *Kingdon v. Sybrant*, 158 N.W.2d 863 (N.D.1968).

◼ An insane delusion is a belief in facts that no rational person would believe, not founded upon evidence, and not removable by evidence. *Matter of Estate of Flaherty*, 446 N.W.2d 760 (N.D.1989). *See also Matter of Estate of Herr*, 460 N.W.2d 699 (N.D.1990). In *Flaherty*, we "distinguish[ed] between mistaken beliefs not produced by mental illness, simply because they are based on evidence which is incomplete or misleading, and those irrational false beliefs produced by a mental illness."

446 N.W.2d at 765. We quoted with approval from 1 Bowe–Parker: *Page on Wills* § 12.29, 631 (1960):

"An insane delusion, therefore, is more than just a mere delusion, a false belief, an eccentricity, a clash between two persons of different temperament or personality, or a religious or racial prejudice of ancestral origin. It is a delusion that is the product of a sick or diseased mind and that is held to without evidence or rational basis."

Dwight and Gregg point to evidence that they say establishes that Ervin, prior to the signing of his will, did not accept any blame for his divorce, drank excessively and took Valium, refused doctor-recommended hospitalization for depression and anxiety, mistakenly believed his phone was tapped, was confused and depressed, and wanted to hide his money. They also point to testimony that his insurance agent, one month before Ervin's death, believed Ervin might commit suicide. Dwight and Gregg contend that this evidence proves that Ervin was possessed by an insane delusion at the time he signed his will.

However, there is considerable contrary evidence which supports the findings of fact underlying the conclusion that Dwight and Gregg did not meet their burden of proving an insane delusion. Several witnesses testified that Ervin believed that everybody "should make it on their own" and that Ervin was a stubborn, difficult and demanding man who blamed his sons and friends for not doing more to prevent his and Cora Jean's divorce. Testimony indicated that although one son recommended marital counseling, neither son did much to save Ervin's marriage. Indeed, one son testified on behalf of Cora Jean at the divorce trial. There also was testimony that Ervin became very upset if the family refused to follow his rules.

Other witnesses testified that Ervin was the kind of man who would do something simply to spite those whom he believed wronged him. Ervin was upset with Dwight and disapproved of his farming practices and spending habits. He was upset with Gregg because Gregg had fathered a child out of wedlock. Ervin's lawyer testified that Ervin never indicated an inclination to pay for the education of his grandchildren and never acknowledged Gregg's illegitimate daughter.

Several witnesses testified they never observed Ervin drunk or believed that he was under the influence of drugs. Dr. Ruffalo testified that to his knowledge Ervin did not abuse his prescribed low dosage of Valium. Dr. Ruffalo also testified that because a person refuses hospitalization or is depressed or commits suicide does not mean that person is insane.

This evidence supports a view that Ervin's belief in his sons' contributions to his divorce or lack of effort to save his marriage was less an insane delusion than it was a "mere delusion, a false belief, an eccentricity ...", *Page on Wills, supra,* and his belief was neither irrational nor beyond the evidence. *Matter of Estate of Flaherty, supra.*

We believe there was ample testimony to provide the trial court with an alternative explanation for the unusual manner in which Ervin devised his property and to support the findings underlying the conclusion that Dwight and Gregg did not meet their burden of proving their father suffered from insane delusions. We therefore conclude that the trial court's findings of fact comport with at least one permissible view of the evidence and accordingly, are not clearly erroneous.

Affirmed.

ERICKSTAD, C.J., and MESCHKE and VANDE WALLE, JJ., concur.

Justice H.F. GIERKE, a member of the Court when this case was heard, resigned effective November 20, 1991, to accept appointment to the United States Court of Military Appeals and did not participate in this decision.