2015 ND 188

**In the ESTATE OF John T. GASSMANN, deceased.**

**Bell State Bank & Trust, f/k/a State Bank & Trust, as Personal Representative of the Estate of John T. Gassmann, Deceased, Petitioner and Appellee**

v.

**Maggie A. Oakland, Respondent and Appellant.**

**No. 20140255.**

Supreme Court of North Dakota.

July 28, 2015.

Rehearing Denied Aug. 25, 2015.

Berly D. Nelson (argued) and Ian Mc-Lean (appeared), Fargo, N.D., for petitioner and appellee.

David J. Chapman, Fargo, N.D., for respondent and appellant.

Margaret A. Oakland (appeared), Valley City, N.D., respondent and appellant.

KAPSNER, Justice.

[¶ 1] Margaret Oakland appeals from a judgment dismissing her objection to the probate of the will of her father, John T. Gassmann, after a jury found she failed to establish his will was the product of an insane delusion and from an order denying her motion for a new trial. Oakland argues the district court erred in excluding relevant evidence at trial and the court did not adequately address issues raised in her motion for new trial. We affirm.

## I

[¶ 2] Oakland is Gassmann's only biological child. She graduated from high school in 1991, and her parents separated around that time and subsequently divorced after Gassmann experienced incidents in which he believed his wife and others were involved in a conspiracy to poison him for his farmland. In the divorce proceeding, a psychiatric and psychological evaluation by a psychiatrist and a clinical psychologist diagnosed Gassmann with a "delusional disorder."

[¶ 3] According to Oakland, Gassmann believed Oakland's mother was using Oakland to facilitate the poisoning conspiracy and her relationship with Gassmann was permanently and deleteriously altered by his insane delusions, which continued until his death. Oakland claimed Gassmann insisted she stop all communications with her mother, but she refused and Gassmann thereafter distanced himself from her because of the poisoning conspiracy. According to Oakland, Gassmann would have devised his farmland to her but for his insane delusion.

[¶ 4] According to Bell State Bank & Trust, Gassmann was misdiagnosed with a delusional disorder in the 1993 divorce, but actually suffered from a brain tumor and related acromegaly, and he had the tumor removed in 1995. According to Bell State, Gassmann's symptoms disappeared after the surgery, but his relationship with Oakland remained distant and disconnected because Gassmann did not approve of her decisions about education, employment, and marriage.

[¶ 5] After divorcing Oakland's mother, Gassmann began a relationship with Bonnie Bowman, which lasted until his death in February 2012, and he developed a close relationship with her three children. On December 6, 2011, Gassmann executed a will after he was diagnosed with terminal cancer. Gassmann's estate plan devised certain property to Oakland and his will operated with a revocable living trust to devise his interest in his family's farmland to other individuals, including some of Bowman's children.

[¶ 6] Gassmann died in February 2012, and Bell State petitioned for formal probate of his will and for appointment as his personal representative under the will. Oakland objected to the probate of Gassmann's will, claiming he executed the will under an insane delusion. Oakland challenged the validity of Gassmann's revocable living trust in a separate action, but that action was dismissed as untimely. *See Oakland v. Bowman,* 2013 ND 217, ¶¶ 1, 12, 840 N.W.2d 88 (affirming dismissal of Oakland's untimely objection to revocable trust). Oakland thereafter moved to amend her objection to the probate of Gassmann's will to include an objection to the revocable living trust, and the district court denied her motion.

[¶ 7] Oakland initially retained counsel to contest Gassmann's will, but she subsequently represented herself. Before a scheduled jury trial, Bell State filed several motions in limine, including motions to exclude evidence, testimony, comment, or reference at trial to Gassmann's military experience, his belief that Oakland was not his biological daughter, his statements relating to his mental state after he executed the December 2011 will, his remote statements in the 1990s relating to the poisoning conspiracy, and his statements evidencing his mental state which were not related to the poisoning conspiracy. Bell State also sought to exclude evidence about Gassmann's amendments to his revocable living trust after he executed his December 2011 will, and his nonprobate transfers of property. Bell State generally claimed the evidence identified in the motions in limine was not relevant under

N.D.R.Ev. 401 and 402, and even if relevant, the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence under N.D.R.Ev. 403.

[¶ 8] The district court granted Bell State's motions in limine, but generally informed Oakland the motions could be revisited in the context of the evidence presented at trial, including the parties' experts' opinions about the symptoms of Gassmann's alleged insane delusion. The court advised Oakland it did not then know the extent of the experts' testimony about Gassmann's alleged insane delusion and would allow her to introduce evidence covered by the motions in limine to the extent her experts relied on that evidence to conclude Gassmann was suffering from an insane delusion. A jury returned a verdict finding Oakland failed to establish Gassmann's will was the product of an insane delusion, and the district court thereafter denied her motion for a new trial.

## II

[¶ 9] Under N.D.C.C. § 30.1–15–07, a party contesting a will has the burden of proving lack of testamentary capacity. *Matter of Estate of Aune,* 478 N.W.2d 561, 564 (N.D.1991). Whether a testator was suffering from an insane delusion which materially affected a will is a question of fact. *Id.* A will contestant must establish a will was the product of the insane delusion and the testator, if not laboring under the insane delusion, would have devised the property differently. *Id.*

[¶ 10] An insane delusion is a belief in facts that no rational person would believe, not founded upon evidence, and not removable by evidence. *Aune,* 478 N.W.2d at 564; *Matter of Estate of*

*Flaherty,* 446 N.W.2d 760, 765 (N.D.1989). In *Flaherty,* this Court "distinguish[ed] between mistaken beliefs not produced by mental illness, simply because they are based on evidence which is incomplete or misleading, and those irrational false beliefs produced by a mental illness," explaining:

"An insane delusion, therefore, is more than just a mere delusion, a false belief, an eccentricity, a clash between two persons of different temperament or personality, or a religious or racial prejudice of ancestral origin. It is a delusion that is the product of a sick or diseased mind and that is held to without evidence or rational basis."

446 N.W.2d at 765 (quoting 1 Bowe–Parker: *Page on Wills* § 12.29, p. 631 (1960)).

## III

[¶ 11] Oakland argues the district court abused its discretion in granting and partially upholding Bell State's motions in limine to exclude broad categories of probative circumstantial evidence of Gassmann's mental illness. She argues the court erred in granting five overlapping motions in limine excluding: (1) Gassmann's "remote" statements in the 1990s relating to the claimed poisoning conspiracy; (2) Gassmann's "post-will" statements relating to his mental state after executing the December 2011 will; (3) Gassmann's statements evidencing his mental state which were not related to the poisoning conspiracy; (4) Gassmann's belief that Oakland was not his biological daughter; and (5) evidence of Gassmann's military experience. On appeal, Oakland claims the court's rulings on the motions in limine precluded her from introducing deposition testimony of Gassmann's sister, Jo Anne Dalhoff, and testimony of Gassmann's nephew, David Bonello. She claims Dalhoff's excluded testimony provided a suc-

cinct chronology of Gassmann's delusional symptoms from 1990 until December 2011 and Bonello was prepared to testify about Gassmann's delusional thought process when the will was executed in December 2011. Bell State responds the district court did not abuse its discretion in excluding any evidence and Oakland failed to make appropriate offers of proof for the evidence she now claims was improperly excluded.

[¶ 12] We review Oakland's arguments in the context of the evidentiary rules for relevancy and the procedural posture of a motion in limine. Under N.D.R.Ev. 401, relevant evidence means evidence that reasonably and actually tends to prove or disprove any fact that is of consequence to the determination of an action. Relevant evidence is generally admissible. N.D.R.Ev. 402. A district court has discretion to determine whether evidence is relevant, and its decision will not be overturned on appeal absent an abuse of discretion. *Williston Farm Equip., Inc. v. Steiger Tractor, Inc.*, 504 N.W.2d 545, 548–49 (N.D.1993). However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. N.D.R.Ev. 403. A district court has discretion to balance the probative value of proffered evidence against the dangers enumerated in N.D.R.Ev. 403, and we also review that determination under the abuse-of-discretion standard. *Williston Farm Equip.*, at 549.

[¶ 13] A motion in limine is a procedural tool to ensure that potentially prejudicial evidentiary matters are not discussed in the presence of the jury. *Williston Farm Equip.*, 504 N.W.2d at 550; *Shark v. Thompson*, 373 N.W.2d 859, 864 (N.D.1985). The pre-trial exclusion of evidence by a motion in limine, however, is a preliminary order regarding the admissibility of evidence and does not dispense with the need for the proponent of evidence to make an offer of proof at trial so the district court can consider the proffered evidence in the context of other evidence presented during trial. *In re Rubey*, 2013 ND 190, ¶ 7, 838 N.W.2d 446; *Nesvig v. Nesvig*, 2006 ND 66, ¶ 31, 712 N.W.2d 299; *Williston Farm Equip.*, at 550. In the absence of an offer of proof about the substance of the excluded evidence, our review is limited. *In Rubey*, at ¶ 7; *Williston Farm Equip.*, at 550. A self-represented litigant is held to the same procedural rules as litigants represented by counsel, and "we do not apply statutes or rules differently when a party is self-represented." *Schwab v. Zajac*, 2012 ND 239, ¶ 20, 823 N.W.2d 737 (quoting *Mills v. City of Grand Forks*, 2012 ND 56, ¶ 15, 813 N.W.2d 574).

[¶ 14] When the district court ruled on Bell State's motions in limine, the court explained it did not then know the extent of the parties' experts' testimony regarding Gassmann's alleged insane delusion and the court explicitly informed Oakland its rulings depended on that testimony. In addressing Bell State's motion in limine about Gassmann's statements relating to his mental state after his will was executed, the court generally explained its rationale for provisionally granting the motion:

So, in essence, what I'm stating is it more or less depends on what the expert's going to testify to. You two know that, I don't and we'll have to wait until the trial when we start to see where that goes. But, if the expert is not claiming that—if the expert's claiming that that's the basis for the opinion of the diagnosis, I'll allow it briefly for that purpose. If the expert's claiming it's—these state-

ments made afterwards were outside of when the delusions went into remission, I will not allow it. And if it's—the expert has ruled in only poisoning, then I'll not allow it as well. So, to that extent I'll grant the motion but again, it's dependent on the testimony.

MS. OAKLAND: Well, Your Honor, I think what my expert has said in his written report is that evidence for delusional thought process even specifically related to the poisoning delusion and to my mother, is one of the important components of his assessment is to determine that my father still had his delusion at the time of signing the will and still had his delusional way of thinking. And so—

THE COURT: Well, again, that goes to what your expert's going to testify about and I don't know that.

MS. OAKLAND: Okay.

THE COURT: So we'll have to see and we may have to revisit the issue at that time, but within the guideline that I mentioned. And I hope you both understand what I've said, that I'm granting the motion, but I'm not—I'm not precluding it if it's the basis for his diagnosis, and I'm not precluding it if the doctor testifies that there was a significant delusion at the time of the signing of will and I'm not excluding it was part of the—an episode. But other than that, I will grant the motion. But again, I will allow you to revisit it when we get to that point.

[¶ 15] At trial, Oakland's experts testified Gassmann's insane delusion existed until his death. The report of one of Oakland's experts, Psychiatrist Michael Farnsworth, provided:

> Available records, affidavits and diagnostic assessments of Mr. Gassmann strongly support the presence of paranoid delusional disorder. The affidavit of his siblings indicate an early history of paranoid ideation. The formal diagnostic assessment of Drs. Christianson and Sharbo [during Gassmann's divorce] clearly defined his diagnosis as a paranoid delusional disorder, and while Mr. Gassmann did not receive ongoing psychiatric treatment, it is clear from statements he made near the end of his life to family members and friends that he continued to harbor delusional symptoms such as believing that his cancer was a targeted disease perpetrated by the federal government against him, supporting his ongoing, underlying delusional thought pattern.

> Therefore, I conclude to a reasonable degree of medical certainly, that throughout his life, Mr. Gassmann experienced significant paranoid delusions, making a diagnosis of delusional disorder most appropriate. Some of his delusions are potentially severe enough to warrant a diagnosis of schizophrenia. These include beliefs such as that aliens from space have visited him or that he has witnessed their spacecraft. However, functionally, Mr. Gassmann appeared to most individuals outside of the realm of his delusions to be competent, coherent, appropriate without the residual symptoms of schizophrenia or the other disabling effects of that disease.

> . . . .

> Mr. Gassmann labored under the delusion that his wife was poisoning him. This led to his decision to divorce her. He further harbored the belief that his extended family members including his mother-in-law and father-in-law were also in conspiracy against him. He further believed that his ex-wife was adversely influencing their daughter, Margaret, and allegedly

conditioned his relationship with Margaret on her alienating herself from her mother, which she chose not to do. Because Mr. Gassmann was experiencing paranoid delusions regarding family members, he could not objectively identify them as legitimate recipients of his estate upon his death. His choices were most likely influenced by his delusional beliefs about the conspiracies that he believed were arrayed against him from family members and likely made him incapable of objectively identifying family members as legitimate recipients of his estate. His mental illness likely rendered him incapable of identifying his daughter, Margaret, as the rightful inheritor of his farm assets.

. . . .

Most patients with delusional disorders, and it is clear from the records that Mr. Gassmann was such an individual, are often able to function in most areas of their lives without apparent disability. However, in the areas of their specific delusions, it may greatly influence their decision making. Thus, Mr. Gassmann, who was a trained attorney, would certainly understand the mechanical legal aspects of writing a will. However, it is his delusion regarding his family members that would subtly influence his decision about identifying the recipients of his estate. . . . If indeed he believed that family members were out to harm him and that his daughter had failed to remain loyal to him by still communicating with the people that he believed were trying to harm him, it is understandable that he might write deny her the inheritance of the farmland. Unfortunately that decision is predicated on a false belief. If he had not harbored such a belief, his decision regarding his will and dis-

position to his daughter may well have been different.

After a review of the medical records and affidavits of witnesses, I conclude, to a reasonable degree of medical certainty, that Mr. John T. Gassmann was experiencing a delusional disorder up to the time of his death which greatly influenced his decision regarding the disposition of his assets. I believe his decision-making capacity was greatly impaired because he harbored delusions of being harmed by family members, which in turn clouded his judgment regarding his daughter and her role in his estate planning.

[¶ 16] At trial, the district court admitted some evidence of Gassmann's statements from the 1990s about a poisoning conspiracy. Oakland, however, made no offer of proof about other remote statements excluded by the court, and in the absence of an appropriate offer of proof, we are unable to review her claim the court erred in excluding remote evidence of his alleged insane delusion.

[¶ 17] At trial, Oakland was permitted to testify about statements made to her by Gassmann in a January 22, 2012, conversation with him. Oakland, however, made no other offers of proof about other evidence indicating Gassmann's state of mind near the time when he executed his will. Before trial, the parties addressed Dalhoff's deposition testimony and the court ruled on objections made during the taking of that deposition. The record reflects, however, the court did not then review the entire contents of Dalhoff's deposition and Oakland made no offer of proof about the deposition at trial. Moreover, although Oakland claims Bonello attended the trial, she made no offer of proof about his proposed testimony at trial.

[¶ 18] Although Oakland claims she was under the impression her evidence had been excluded, the district court's rulings on the motions in limine belie her impression. As a self-represented litigant, Oakland is held to the same procedural rules as litigants represented by counsel. *Schwab*, 2012 ND 239, ¶ 20, 823 N.W.2d 737. The court's rulings on the motions in limine did not unduly limit her presentation of her case; rather, she failed to make appropriate offers of proof for the evidence she now claims was improperly excluded. On this record, we cannot say the district court's rulings on Bell State's motions in limine were arbitrary, capricious, or unreasonable, and we conclude Oakland did not make an appropriate offer of proof at trial to properly preserve issues about the evidence she now claims was improperly excluded, including Dalhoff's deposition testimony and Bonello's proposed testimony. We therefore conclude the court did not improperly preclude Oakland from presenting evidence to the jury about Gassmann's alleged mental illness.

## IV

[¶ 19] Oakland argues the district court erred in excluding evidence of amendments to Gassmann's revocable trust made after the will was executed, which she claims showed how Gassmann's will disposed of his property. She claims Gassmann amended the revocable trust two times after he executed his will on December 6, 2011, and evidence of the beneficiaries under those amendments was relevant to show the ultimate disposition of his property under the will.

[¶ 20] At trial, Oakland sought to elicit testimony from the attorney who drafted Gassmann's December 2011 will and the following colloquy occurred:

THE COURT: ... Ms. Oakland, you said state of mind. What did you mean by that?

MS. OAKLAND: Well, I think that, you know, he changed his mind a number of times in a very short time, and I think that that's—about who would actually get the farm land. Mr. Nelson [counsel for Bell State] could have left it as, you know, he exercised the power of appointment for the property in the trust. He didn't do that. He said exactly who would benefit at that time on that date in the trust, and so I think it would be highly prejudicial to let him give that information and restrict me from bringing out that, well, yes, that's what he decided on December 6, but then he continued to change his mind about this.

THE COURT: Change his mind about?

MS. OAKLAND: Who the beneficiaries would be.

THE COURT: And how does that affect the will that was signed on December 6?

[MS. OAKLAND]: It shows that my father didn't have—well, I mean, I guess that's a question of fact what it shows. You know, does it show indecision? Does it show—

THE COURT: The indecision about the trust or the indecision about the will?

MS. OAKLAND: Indecision about what should happen to the property.

THE COURT: And why is that relevant to what took place on December 6?

MS. OAKLAND: Well, I think it—I think his state of mind, you now, on December 7, December 16, and December 22 (inaudible) by the same factors, primarily the same factors on December 6.

**334**

THE COURT: And what factors were those? You talking about the delusions?

MS. OAKLAND: I guess that's my—that's my hypothesis.

THE COURT: .Well, I—

MS. OAKLAND: That's my argument. There may be other interpretations. · But, I mean, it's a—it's an issue of fact. And I think it's something that can be given to the jury and they can decide what inferences are appropriate from there. Especially after Mr. Nelson has given the impression that, you know, the land went to certain people and identify certain people who, you know—and that's not consistent with, you know, who the actual beneficiaries are at this point.

THE COURT: And that's what you challenge in your action, correct?

MS. OAKLAND: Um—hum. Well, yeah. Well, the other action was I intended to like consolidate probate and the trust issue, but obviously that's a done—dead issue.

THE COURT: Keeping in mind our third element that we've talked about, what relevant does—if there were changes in the trust after December 6, how does that address the third element about whether your father would have devised his property differently but for the delusions?

MS. OAKLAND: Well, I'm not sure that it goes to the—can I just get clarification, Your Honor, is it important to go through the third element as opposed to the first two?

· THE COURT: No. No. You can address it as to the first two.

MS. OAKLAND: Okay. Well, I mean, I have my opinion about what was going on, but as I said it's not—I—I think my dad probably experienced a lot of dissonance related to, you know, having the family life at one time and feeling like,

you know, he couldn't leave property to his daughter, farm property, and struggling with, well, what does he want to do with it. You know, I mean, that's-that's relevant information.

THE COURT: Mr. Nelson?

MR. NELSON: Yes, please, Your Honor. You know, she can still argue to the jury—I mean, she—there's no dispute that she wasn't the beneficiary on December 6. You know, that—or that he didn't put the—he didn't give the land to her. He put it in his trust for the benefit of other people. There's no dispute about that. She can certainly still make that argument to the jury, you know, if she's arguing about her if that's what she was just saying.

But the fact of the matter is, Judge, you asked the question and that's the correct answer. This was—the trust stuff, those changes that was in the RLT. That's already been appeal—it's litigated, appealed to the supreme court, decided, and done. And that stuff has no bearing on December 6, 2011, which is the day he did the will. And so, you know, I guess that's the test so I don't know why we would expand that.

MS. OAKLAND: I think—

THE COURT: Well—go ahead.

MS. OAKLAND: I was just gonna say that try to restrict assessment to December 6 when talking about it (inaudible) three years. That's—I mean, I— I just think that's very artificial and prejudicial because obviously certain people had access to them on December 6 and I wasn't one of them.

THE COURT: I'm going to allow you to ask this witness whether there were other changes made to the trust, but we're not going to get into what changes . were made.

MS. OAKLAND: That's fine. Your Honor.

[¶ 21] Oakland failed to make a timely challenge to the revocable trust. *See Oakland*, 2013 ND 217, ¶¶ 1, 12, 840 N.W.2d 88 (affirming dismissal of Oakland's untimely objection to revocable trust). Moreover, Oakland acquiesced in the court's ruling about the beneficiaries under the revocable trust and failed to make a formal offer of proof on the beneficiaries under the amendments to the revocable trust to preserve the issue for appellate review. We conclude Oakland failed to preserve this issue for appellate review.

V

 [¶ 22] Oakland argues the district court abused its discretion in excluding evidence of Gassmann's nonprobate transfers to Bowman's family while allowing Bell State to introduce evidence of his nonprobate transfers to Oakland. In provisionally granting Bell State's motion in limine to exclude evidence of Gassmann's lifetime transfers of land to Bowman or her children, the court advised Oakland it would revisit the issue during trial if there was evidence Gassmann would have devised the land differently but for the alleged insane delusion. At trial, Oakland did not make an appropriate offer of proof on this issue, and she did not preserve this issue for appellate review.

VI

[¶ 23] Oakland argues the district court failed to adequately address issues raised in her motion for new trial. A district court's denial of a motion for a new trial is reviewed under the abuse-of-discretion standard. *Rittenour v. Gibson*, 2003 ND 14, ¶ 13, 656 N.W.2d 691. Oakland's motion for a new trial raised many of the same issues raised in her appeal, and we conclude the court's denial of her

motion was not arbitrary, capricious, or unreasonable. We conclude the court did not abuse its discretion in denying her motion for a new trial.

VII

[¶ 24] We affirm the judgment and the order denying Oakland's motion for a new trial.

[¶ 25] GERALD W. VANDE WALLE, C.J., LISA FAIR McEVERS, DALE V. SANDSTROM and DANIEL J. CROTHERS, JJ., concur.